# EXHIBIT A

# EXHIBIT A

## DECLARATION

Kristina N. Holmstrom, upon her oath, states as follows:

1.      I am a partner in the law firm of Lewis Roca Rothgerber Christie LLP and am the lead attorney representing Defendant Property and Casualty Insurance Company of Hartford in this matter.

2.      On June 9, 2017, paralegal Michell Denman, of my office and under my supervision, reviewed and printed the Superior Court docket.

3.      Exhibit A consists of true and complete copies of all pleadings and other documents filed in the state court proceeding entitled *Chris Vail v. Property and Casualty Insurance Company of Hartford*, Pima County Superior Court, C20172269.

4.      I also make this Declaration in support of the Notice of Removal.  I practice primarily in the area of insurance law and thus I am generally familiar with attorneys' fees in bad faith cases.  Attorneys handling bad faith cases typically charge 33% to 45% contingent fees.  In my experience, a typical bad faith case usually generates over $150,000 in attorneys' fees.

5.      I declare under penalty of perjury that the foregoing is true and correct. DATED this 12th day of June, 2017.

By: */s/ Kristina N. Holmstrom*
Kristina N. Holmstrom



## Case Information

**Case Number:** C20172269

**Filing Date:** 5/9/2017

**Caption:** CHRIS VAIL VS. PROPERTY A

**Judge:** CYNTHIA T. K

## Party Information

| Party Full Name | Party Role | Name Type | DOB |
|---|---|---|---|
| CHRIS VAIL | Plaintiff | True | |
| PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD | Defendant | True | |
| THE HARTFORD | Defendant | Doing Business As (DBA) | |

## Case/Document Information

| Document Type | Document SubType | Document Caption | File Date | Image |
|---|---|---|---|---|
| Affidavit | Certificate Of Service | CERTIFICATE OF SERVICE | 5/22/2017 | Available at Courthouse |
| Misc | Demand For Jury Trial | Demand for Jury Trial | 5/12/2017 | Available at Courthouse |
| Misc | Exhibits | Exhibits A - H | 5/9/2017 | Available at Courthouse |
| Misc | Documents/Records Filed | Documents/Records Filed | 5/9/2017 | Available at Courthouse |
| Arbitration | Certificate Of Compulsory Arbitration | Certificate Of Compulsory Arbitration | 5/9/2017 | Available at Courthouse |

| Summons | Summons/Subpoena | Summons/Subpoena | 5/9/2017 | Available at Courthouse |
| Open | Petition & Complaint | Petition & Complaint | 5/9/2017 | Available at Courthouse |
| Receipt | All Money Receipts | All Money Receipts 2816657 | 5/9/2017 | Available at Courthouse |

 CT Corporation

**Service of Process Transmittal**
05/17/2017
CT Log Number 531245035

**TO:** Michael Johnson, Legal Assistant
The Hartford
1 Hartford Plz, HO-1-09
Hartford, CT 06155-0001

**RE:** **Process Served in Arizona**

**FOR:** Property and Casualty Insurance Company of Hartford (Domestic State: IN)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | CHRIS VAIL, Pltf. vs. Property and Casualty Insurance Company of Hartford, etc., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Certificate, Complaint, Exhibit(s), Demand, First Set(s) of Request |
| **COURT/AGENCY:** | Pima County - Superior Court, AZ<br>Case # C20172269 |
| **NATURE OF ACTION:** | Insurance Litigation |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Phoenix, AZ |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 05/17/2017 postmarked on 05/15/2017 |
| **JURISDICTION SERVED :** | Arizona |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days, not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Kesha A. Hodge<br>MERLIN LAW GROUP, P.A.<br>2999 North 44th Street, Suite 520<br>Phoenix, AZ 85018<br>480-315-9980 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 05/18/2017, Expected Purge Date: 05/23/2017 |
| | Image SOP |
| | Email Notification, Michael Johnson MICHAEL.JOHNSON@THEHARTFORD.COM |
| | Email Notification, Massimo Fraschilla Massimo.Fraschilla@thehartford.com |
| | Email Notification, Fiona Rosenberg Fiona.Rosenberg@thehartford.com |
| **SIGNED:**<br>**ADDRESS:**<br><br><br>**TELEPHONE:** | C T Corporation System<br>3800 N Central Avenue<br>Suite 460<br>Phoenix, AZ 85012<br>602-248-1145 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



02 1A
000434B936
MAILED FROM ZIP CODE 850



7017 0530 0000 3037 8662

PROPERTY AND CASUALTY INS CO OF HARTFORD
CT CORPORATION SYSTEM
3800 N. CENTRAL AVE., STE 460
PHOENIX, AZ 85012
C20172269



**DEPARTMENT OF INSURANCE**
North 44th Street, Suite 210
enix, Arizona 85018-7269

Person/Attorney Filing: Kesha A Hodge
Mailing Address: 2999 N. 44th Street Suite 520
City, State, Zip Code: Phoenix, AZ 85018
Phone Number: (480) 315-9980
[ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 021824, Issuing State: AZ
Attorney E-Mail Address: KHodge@merlinlawgroup.com

STATE OF ARIZONA
DEPT. OF INSURANCE

MAY 1 5 2017
TIME 2:0
SERVICE OF PROCESS

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
# IN AND FOR THE COUNTY OF PIMA

CHRIS VAIL
Plaintiff(s),

Case No. C20172269

HON. CYNTHIA T. KUHN

V.

**SUMMONS**

PROPERTY AND CASUALTY INSURANCE
COMPANY OF HARTFORD, DBA THE HARTFOR
Defendant(s).

To: PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD, DBA THE HAF

WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS
YOUR RIGHTS. READ THIS SUMMONS CAREFULLY. IF YOU DO NOT
UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.

1. A lawsuit has been filed against you. A copy of the lawsuit and other related court
paperwork has been served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an
Answer in writing with the Court, and you must pay the required filing fee. To file your
Answer, take or send the papers to Office of the Clerk of the Superior Court,
110 West Congress Street, Tucson, Arizona 85701 or electronically file your
Answer through AZTurboCourt at www.azturbocourt.gov.
Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top
of this Summons. Note: If you do not file electronically you will not have electronic
access to the documents in this case.

3. If this Summons and the other court papers were served on you within the State of
Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the
date of service, not counting the day of service. If the papers were served on you
outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR
DAYS, not counting the day of service.

12/30/2016 CAC

AZturboCourt.gov Form Set#218301

Requests for reasonable accommodations for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of Pima                     *May 09, 2017*                     .

*Toni L. Hellon*
Clerk of the Superior Court

By: *Sandra Castillo*
        Deputy Clerk



12/30/2016 CAC

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

5/9/2017 3:23:40 PM

BY: SANDRA L CASTILLO
DEPUTY

Person/Attorney Filing: Kesha A Hodge
Mailing Address: 2999 N. 44th Street Suite 520
City, State, Zip Code: Phoenix, AZ 85018
Phone Number: (480) 315-9980
[ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 021824, Issuing State: AZ
Attorney E-Mail Address: KHodge@merlinlawgroup.com

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF PIMA

CHRIS VAIL
Plaintiff(s),

Case No. _____ C20172269 _____

V.

**CERTIFICATE OF COMPULSORY ARBITRATION**

PROPERTY AND CASUALTY INSURANCE
COMPANY OF HARTFORD, DBA THE
HARTFORD
Defendant(s).

I certify that I am aware of the dollar limits and any other limitations set forth by the

Local Rules of Practice for the Pima County Superior Court, and I further certify that

this case IS NOT subject to compulsory arbitration, as provided by Rules 72 through 77 of

the Arizona Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this *May 09, 2017*

By: *Kesha A Hodge /s/* _____

Plaintiff/Attorney for Plaintiff

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

5/9/2017 3:23:40 PM

BY: SANDRA L CASTILLO
DEPUTY

Case No. C20172269
HON. CYNTHIA T. KUHN

Michael N. Poli (State Bar No. 006431)
MPoli@merlinlawgroup.com
Kesha A. Hodge (State Bar No. 021824)
KHodge@merlinlawgroup.com
MERLIN LAW GROUP, P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone:    (480) 315-9980
Facsimile:      (480) 315-9984
*Attorneys for Plaintiff*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF PIMA

| | |
|---|---|
| CHRIS VAIL, an individual,<br><br>Plaintiff,<br><br>v.<br><br>PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD, an Indiana corporation, commonly known and doing business as THE HARTFORD<br><br>Defendant. | Case No.:<br><br>**COMPLAINT**<br><br>**(Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Tortious Bad Faith)**<br><br>**JURY TRIAL DEMANDED** |

For his Complaint, Plaintiff Chris Vail hereby alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Chris Vail ("Vail") is an individual who resides in Pima County, Arizona.

2.    Defendant Property and Casualty Insurance Company of Hartford ("Hartford") is an Indiana corporation, which is commonly known and does business as The Hartford. Hartford conducts business, including insurance transactions, in the State of Arizona. Upon information and belief, Hartford is authorized by the Arizona Department of Insurance to issue and sell property and casualty insurance in the State of Arizona.

T16251142.DOCX1

1

3. The insurance agreement, which is the subject of this action, was sold to Vail in Pima County, Arizona.

4. This lawsuit involves property insurance coverage for certain real property situated in Pima County, Arizona.

5. Subject matter jurisdiction is proper pursuant to Arizona Constitution, article six, section fourteen and Arizona Revised Statutes ("A.R.S.") section 12-123.

6. The amount in controversy exceeds the minimum jurisdictional limit of this Court.

7. Pursuant to A.R.S. § 12-401, venue is proper in this Court.

8. Vail respectfully demands a trial by jury on all issues so triable.

**FACTUAL ALLEGATIONS**

9. Vails owns the real property located at 2013 W. San Juan Trail, Tucson, Arizona 85713 (the "Property").

10. Hartford and/or its affiliate issued an insurance policy to Vail covering the Property, with a policy period beginning November 28, 2011 and ending on November 28, 2012. The policy of insurance is identified as policy number 55RBC423052 (the "Policy"). A certified copy of the Policy is attached hereto as **Exhibit A**.

11. Under the Policy, Hartford agreed to "insure [Vail] against risk of direct physical loss to [covered] property . . . ."

12. On or about July 15, 2012, a storm struck and damaged the Property. The storm included high winds and rain.

13. The Property has a gable and flat construction roof with built-up roofing membrane. The built-up roofing membrane was about eight years old at the time of the storm, and elastomeric coating had been applied over the roofing membrane every one to two years.

14. The winds from the storm lifted the roofing membrane on the south side of the structure and damaged the roof of the Property, allowing for water to enter the structure.

T1625134.DOCX:1

2

15. The National Weather Service reported several strong wind events that took place on the date of loss with wind gusts reported at 60 mph and 61 mph to the east and northeast of the Property.

16. The night of the storm, Vail notified Hartford of the damage to his Property and made a claim with his carrier ("the Claim"). The Claim was assigned as Claim No. PP10789648.

17. Hartford dispatched ServPro to the Property to secure the roof.

18. ServPro was negligent in its repairs. Among other things, ServPro attached the tarp by nailing through the aluminum siding of the home, causing further damage to the Property.

19. Upon information and belief, ServPro also took multiple items from the Property, without the consent of Vail, including but not limited to the clothing and personal effects.

20. Vail has not been reimbursed for the loss of these items.

21. Shortly after the storm, Hartford informed Vail that the estimated costs of repairs was approximately $8,000.00. Vail objected to the presented valuation and assessment of covered damage.

22. On or about August 24, 2012, EFI Global, on behalf of Hartford, inspected the Property to examine the damage to the roof of the Property.

23. Without limitation, EFI Global reported:

a. Displacement of the roofing membrane was observed along the north side of the roof.

b. Delamination of the roofing membrane was observed at various locations throughout the roof just north of the wind damaged section of the roofing membrane.

c. Separation of the vertical section of the solar plumbing line was observed at the southside of the structure.

d. Damage to the roof decking was observed where the solar plumbing line penetrates the roof at the south side of the structure.

T162534.DOCX;1                                3

e.      Damage to the roof decking was observed at the southeast corner of the roof.

f.      Separation of the 2X wood fascia was observed at the east side of the structure at the southeast corner.

24.    EFI Global determined that the built-up roofing membrane, the 10th roof joist (north of the south wall on the east slope of the roof), the roof decking at various locations at the south side of the structure over the southeast and southwest bedrooms, the 2X wood fascia along the east side at the southeast bedroom, the plumbing line of the solar collector system, and the ceiling and wall finishes throughout the south bathroom and the southeast and southwest bedrooms were damaged by wind uplift of the roofing membrane on the date of loss.

25.    The representative from EFI Global who was inspecting the Property refused to enter the attic area. If he had entered the attic area, like a reasonable inspector would have, the representative from EFI Global would also have observed at least six other damaged rafters.

26.    EFI Global recommended that the entire roof membrane be replaced given that wind damage occurred at both ends of the structure. EFI also recommended that a qualified solar technician evaluate the collector system to determine if it is repairable.

27.    On or about September 12, 2012, Hartford presented Vail with an estimate of $20,496.96, as purportedly the estimate to repair the covered damage. Vail again objected to the valuation and assessment of covered damage.

28.    The roof continued to leak during the adjustment of the claim, as the vendors that Hartford used to tarp and cover the roof failed to install the tarp properly.

29.    Vail requested that an independent engineer come out and inspect the Property for structural damage, which Hartford denied.

30.    On or about September 27, 2013, Hartford provided Vail with a revised estimate in the amount of $30,370.13, as the purported cost of repairs. Vail again disagreed with the scope of damage and the valuation presented.

31.    Hartford refused to timely and promptly agree to adequate repair amounts.

T1625134.DOCX:1                                                 4

32.    Frustrated with the stalling tactics of the Hartford, Vail filed a complaint with the Arizona Department of Insurance ("ADOI Complaint") on or about February 4, 2013.

33.    On or about December 13, 2013, Vail, after unsuccessful efforts to get Hartford to properly valuate the claim, retained the public adjusting firm of Brown-O'Haver, LLC ("Brown-O'Haver") to assist with the claim evaluation, claim preparation and adjuster of the loss.

34.    On or about December 16, 2013, Hartford sent a letter to Vail, responding to his ADOI Complaint. Therein, Hartford, among other things, stated:

> After discussions with you regarding what damages were a result of this loss and what portions of your Contractor's estimates were presented to The Hartford for payment but not caused by or related to this loss, the Appraisal Clause of the policy was presented to you as an option. From this point you invoked the Appraisal Clause of the homeowner's policy. Following the conditions of the policy and the appraisal process, specific Appraiser's were appointed. At this juncture in the Appraisal process, an Umpire must be selected and agreed to by both appraisers. At this time, you have declined to accept each Umpire representative that has been presented to you. **Since you have not chosen an Umpire to resolve and conclude the Appraisal portion of this loss, The Hartford has petitioned the Court to assign an Umpire to this case.** Once the Courts have assigned an Umpire, the facts of this loss will be presented and will be evaluated by the Umpire and a final decision made. Until the time the Umpire makes their decision regarding these damages, The Hartford will not be issuing any further monies to you for damages to the dwelling.

(Emphasis added.) A copy of the December 16, 2013 letter is attached as **Exhibit B**.

35.    Contrary to Hartford's statement, the appraisal provision had been invoked by Hartford, not Vail.

36.    Moreover, the Policy, in pertinent part, provided that once appraisal was demand, each party was required to select "a competent and impartial appraiser."

37.    Hartford knew that Vail lacked the necessary background, training or experience, and as the insured, thus, would not qualify as a "competent and impartial appraiser."

38.    Yet, to gain unfair advantage, Hartford suggested and encouraged Vail to serve as his own appraiser, knowing that Vail was not knowledgeable or suited to serve as an appraiser.

39.    Hartford appointed an out-of-state biased appraiser.

T1625114.DOCX;1                                5

40.    Vail retained the services of attorney, Steve Silverman, to address the appraisal and umpire issues with Hartford.

41.    Vail also retained Michael Shontel as his appraiser to represent his interests in the appraisal process.

42.    Unbeknownst to Vail at that time, Hartford, despite its statement in the December 16, 2013 letter, had not petitioned any Court to appoint an umpire.

43.    Once Silverman became involved, he learned that no petition had been filed and got Hartford's counsel to agree to allow the appraisers to see if there was any agreement, before Hartford petitioned for the appointment of a umpire.

44.    On or about January 3, 2014, Brown-O'Haver sent a letter to Hartford outlining some of the questionable conduct by Hartford in handling this claim. A copy of the January 3, 2014 letter is attached as **Exhibit C**.

45.    On or about January 30, 2014, more than ten business days after its last correspondence, Brown-O'Haver sent a follow up letter to Hartford, requesting a response to its January 3, 2014 letter.

46.    On or about February 14, 2014, Brown-O'Haver and Hartford had a telephone conversation, wherein Hartford indicated that it would be responding to the previous letters. Brown-O'Haver sent two letters, confirming the conversation and highlighting further questionable conduct by Hartford in the adjustment process. Copies of the February 14, 2014 letters are attached as **Exhibits D and E** respectively.

47.    On or about February 14, 2014, Hartford responded in writing.

48.    On or about February 17, 2014, Hartford remitted a partial payment to Vail of $11,629.29 towards the actual cash value of the structure.

49.    On or about February 19, 2014, Hartford refunded the deductible to Vail. His Policy contained an endorsement that waived the deductible if the claim payment was $22,500.00 or more. Hartford remitted to Vail a check in the amount of $500.00.

50. The matter proceeded to appraisal.

51. For a variety of reasons, many outside the control of Vail, the joint inspection of the Property by the appraisers was not completed until November 11, 2014.

52. Nearly six months later, on or about May 5, 2015, Brown-O'Haver sent a letter to Hartford expressing concern that the appraiser representing Hartford was unreasonably delaying this claim, to the detriment of the insured, Vail. A copy of the May 5, 2015 letter is attached as **Exhibit F**.

53. The appraisers, on or about June 4, 2015, determined that the actual cash value of the covered damage to the dwelling/structure was $74,829.50. A copy of the appraisal award is attached as **Exhibit G**.

54. The appraisal award was more than nine times (9X) the initial $8,000.00 amount that Hartford had claimed was appropriate for the repairs and almost four times (4X) more than the $20,496.96 bid that Hartford presented on or about September 12, 2012.

55. On or about June 30, 2015, Brown-O'Haver sent an email to Hartford inquiring about the payment of the amounts agreed to in the appraisal. A copy of the June 30, 2015 email correspondence is attached as **Exhibit H**.

56. The undisputed amounts of the damages to the dwelling/structure which were agreed upon through appraisal were not remitted to Vail until on or about November 15, 2015, more than five months after the appraisers entered the appraisal award.

57. As of the date of filing this Complaint, Vail and/or Brown-O'Haver have not received any indemnity payment of the damaged personal property.

58. Aware of his obligation to retain the personal property to the extent possible so that Hartford can inspect the items, if it so desires, Vail has retained the damaged personal property.

59. Despite his efforts to secure the items, the damaged personal property has and continues to attract pests and vermins, causing further damage to the items and the Property.

60. Hartford has refused to respond to any correspondence related to the contents, even though the damaged personal property is covered under the Policy.

61. Hartford's failure to pay Vail all insurance proceeds promptly upon completion of its alleged investigation is without legitimate, reasonable or arguable reason in fact or law.

62. Hartford's denial of coverage for Vail's loss breached the Policy. Such conduct also constitutes bad faith and tortious breach of contract and breach of the duty of good faith and fair dealing.

63. Hartford had no arguable, good-faith basis for its refusal to promptly and fully pay the claim.

64. Hartford intentionally inflicted emotional distress on Vail.

65. Hartford negligently inflicted emotional distress on Vail.

66. Hartford proximately caused Vail to incur contractual and consequential damages.

67. Hartford unjustifiably and unreasonably denied and/or underpaid the insurance coverage for Vail's insured loss.

68. Hartford underpaid Vail's claims for damage despite the evidence.

69. Hartford's acts and conduct as alleged above were willful, wanton, malicious, grossly negligent, and done with reckless disregard for the rights of Vail, thereby rising to the level of an independent tort and entitling him to an award of punitive damages.

70. Hartford's refusal and failure to properly investigate and pay the claim was willful and in reckless disregard of Vail's rights.

71. Hartford's underestimate of the damages and refusal to tender additionally owed insurance benefits was a wrongful denial of the claim.

72. Vail has done and performed all those matters and things properly required of him under the Policy, or alternatively, have been excused from performance by the acts, representations, omissions and/or conduct of Hartford.

T1613134.DOCX;1

8

## COUNT ONE

### (Breach of Insurance Contract)

73. Vail incorporates the foregoing allegations by this reference.

74. Hartford agreed to insure Vail under the Policy, and in connection therewith, Hartford undertook indemnity obligations to Vail.

75. Hartford received premiums from Vail in exchange for its indemnity obligations under the Policy.

76. The Policy, like all agreements in the State of Arizona, contains an implied covenant of good faith and fair dealing.

77. Vail fulfilled its obligations under the Policy.

78. By wrongfully failing to process and timely pay the claim, Hartford breached its insurance contract with Vail, including the implied covenant of good faith and fair dealing in that insurance contract, thereby depriving Vail of the benefits it was to have received under that insurance contract.

79. Hartford failed to perform its obligations under the insurance contract.

80. Hartford failed to conduct an adequate and timely investigation of the loss and it failed to make payments owed under the Policy.

81. Hartford breached its contractual obligations to Vail

82. Hartford breached the contract for insurance, including the implied covenant of good faith and fair dealing, thereby giving rise to damages.

83. As a direct and proximate result of the conduct by Hartford, Vail sustained reasonably foreseeable damages in an amount to be proven at trial.

84. Vail is also entitled to an award of attorneys' fees and costs under A.R.S. § 12-341.01.

## COUNT TWO

### (Bad Faith)

85.    Vail incorporates the foregoing allegations by this reference.

86.    Arizona courts have explicitly held that an "insurance contract is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000) (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986)). An "insurer has 'some duties of a fiduciary nature,' including '[e]qual consideration, fairness and honesty.'" *Id.*

87.    "[T]he insurer's eventual performance of the express covenant — by paying the claim — does not release it from liability for 'bad faith.'" *Id.* (*citing Rawlings*, 151 Ariz. at 156, 726 P.2d at 572). "Thus, if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'" *Id.* (*quoting Deese v. State Farm Mutual Auto. Ins. Co.*, 172 Ariz. 504, 508, 838 P.2d 1265, 1270 (1992)).

88.    Furthermore, "[t]he carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy. It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy. It cannot lowball claims or delay claims hoping that the insured will settle for less. Equal consideration of the insured requires more than that." *Zilisch*, 196 Ariz. at 238, 995 P.2d at 280.

89.    "Where coverage is not contested but the amount of the loss is disputed, the insurer is under a duty to pay any undisputed portion of the claim promptly. Failure to do so amounts to bad faith." *Borland v. Safeco Ins. Co. of America*, 147 Ariz. 195, 200, 709 P.2d 552, 557 (App. 1985) (citations omitted).

T162$134.DOCX:1

10

90.   In all aspects of investigating or evaluating a claim, an insurance carrier is required to give as much consideration to policyholder's interests as it does to its own interests.

91.   Arizona law provides that "the insured is entitled to expect that the insurer will be 'on his side' at least to the extent of treating him honestly and fairly. . . ." *Rawlings*, 151 Ariz. 149, 155, 726 P.2d 565, 571 (1986)

92.   Under Arizona law, "An insurance company must conduct an 'adequate investigation' into an insured's claim for benefits." *American Family Mut. Ins. v. Grant*, 222 Ariz. 507, 512, 217 P.3d 1212, 1217 (App. 2009).

93.   "Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578; *Nardelli v. Metropolitan Group Property & Cas. Ins. Co.*, 230 Ariz. 592, 604, 277 P.3d 789, 801 (App. 2012).

94.   "An insurance company's failure to adequately investigate . . . becomes material when a further investigation would have disclosed relevant facts." *Aetna Cas. & Sur. Co. v. Superior Court in and for County of Maricopa*, 161 Ariz. 437, 440, 778 P.2d 1333, 1336 (App. 1989).

95.   The Unfair Claims Settlement Practices Act, as codified in A.R.S. and the Arizona Administrative Code, among other things, requires that, "An appropriate reply shall be made within 10 working days on all other pertinent communications from a claimant which reasonable suggest that a response is expected."   *See* A.A.C. R20-6-801(E)(3).

96.   Hartford did not substantively respond to or communicate with Vail and/or Brown-O'Haver within ten working days to the many of the correspondence sent by Vail and/or Brown-O'Haver. Hartford also did not notify Vail and/or Brown-O'Haver as to whether it needed more time to make the determination and/or outline the reasons more time was needed.

97.   "When recovery is sought under an insurance contract, the insured has the burden of proving that his loss was due to an insured risk. In order to establish a prima facie case, [the insured] must prove the insurance policy, the happening of the insured event, and the giving of

1  notice as provided in the policy. The insurer, on the other hand, has the burden of showing that

2  the loss was within a policy exclusion." *Pacific Indem. Co. v. Kohlhase*, 9 Ariz. App. 595, 597,

3  455 P.2d 277, 279 (1969).

4      98.   Vail established a prima facie case for recovery under the Policy.

5      99.   Vail's Claim is a covered loss under the Policy.

6      100.   Hartford did not present Vail and/or Brown-O'Haver with any evidence to show

7  that the Claim was excluded.

8      101.   Pursuant to the terms of the Policy, Hartford was obligated to pay Vail for the loss

9  associated with and arising from the storm.

10     102.   Pursuant to the Policy and Arizona common law, Hartford owes and continues to

11 owe a duty of good faith and fair dealing to Vail. Hartford breached its duty of good faith and

12 fair dealing to Vail, both substantively and by bad faith claims handling.

13     103.   Hartford failed to conduct an adequate and timely investigation of the loss and of

14 Vail' Claim.

15     104.   Hartford failed to process the claim in a proper manner.

16     105.   Without any reasonable justification for doing so, Hartford has failed to make

17 payments owed to Vail under the Policy for the loss, by committing improper acts.

18     106.   Hartford improperly denied, refused to pay and/or underpaid the Claim.

19     107.   Hartford refused and failed to pay for the damage to the Property and contents.

20     108.   All conditions precedent imposed on Vail by the insurance policy have been

21 performed, have occurred, or have been waived.

22     109.   As a direct and proximate result of the acts and omissions of Hartford, Vail has

23 suffered both contract damages and extra-contractual / consequential damages.

24     110.   Hartford's actions in failing to adequately investigate claims and intentionally

25 undervaluing claims shows a clear disregard for the interests of Vail and provides a basis for

26 exemplary damages under Arizona law.

27

T1625134.DOCX;1                                         12

1    111.   Vail is entitled to an appropriate award of punitive damages.

2    112.   Vail is also entitled to an award of its attorneys' fees under A.R.S. § 12-341.01.

3    WHEREFORE, on his causes of actions, Plaintiff Chris Vail requests judgment against

4    Defendant Property and Casualty Insurance Company of Hartford as follows:

5           A.    For compensatory damages in a just and reasonable amount (including both

6                 contractual damages and extra-contractual or consequential damages);

7           B.    For exemplary or punitive damages in a just and reasonable amount;

8           C.    For attorneys' fees and costs;

9           D.    For pre- and post-judgment interest;

10          E.    For taxable costs pursuant to A.R.S. § 12-341; and

11          F.    For such other and further relief as the Court deems just and proper.

12   DATED this 9th day of May 2017.

13

14                                 MERLIN LAW GROUP, P.A.

15

16                                 By___ /s/ Kesha A. Hodge_____
                                        Michael N. Poli
17                                      Kesha A. Hodge
18                                      2999 North 44th Street, Suite 520
                                        Phoenix, Arizona 85018
19                                      Attorneys for Plaintiff

20

21

22

23

24

25

26

27

T1625134.DOCX:1                               13

Exhibit A



**THE**
**HARTFORD**

This will verify that, to the best of the undersigned's knowledge, the attached is complete and accurate representation of insurance policy number 55RBC423052 effective 11/28/2011 to 11/28/2012 as appeared on 7/15/2012 issued by Property and Casualty Insurance Company of Hartford to Chris Vail. The documents and/or information produced herewith are kept and maintained in the ordinary course of business of Property and Casualty Insurance Company of Hartford.

Signature

STATE OF CONNECTICUT

COUNTY OF HARTFORD

Before me personally appeared, Tammy Dennis, to me well known and known to me to be the person described in and who executed the foregoing instrument, and acknowledged to and before me that, Tammy Dennis, executed said instrument for the purposes therein expressed.

WITNESS my hand and official seal, this 9th day of January, 2014.

Notary Public
State of Connecticut

My Commission expires ___10/31/17___

This ENDORSEMENT  Page With the Forms And Endorsements
Listed Below  AMENDS    Your HOMEOWNERS POLICY.
CHANGE #   01  EFFECTIVE 03-28-12

INSURER: PROPERTY & CASUALTY INS. COMPANY OF HARTFORD
200 HOPMEADOW STREET, SIMSBURY, CT 06089 .

THE
HARTFORD

| DECLARATIONS | |
| PLIC 2000 HO | POLICY NO. 55 RBC423052 |

| Named Insured and RESIDENCE PREMISES | VAIL, CHRIS 2013 W SAN JUAN TRL TUCSON                     AZ 85713 |

Policy Period 12:01 A.M. Standard Time
at the Residence Premises ──────▶        FROM 11-28-11   TO 11-28-12      TERM: 1 YEAR

Producer Name:                                         CODE: 553780 MBU
CUSTOMER SERVICE:   1-800-423-0567      CLAIM SERVICE:   1-877-805-9918

TOTAL POLICY PREMIUM:   $   1,609.00

---

**COVERAGE IS PROVIDED WHERE A LIMIT OF LIABILITY IS SHOWN FOR THE COVERAGE.**

---

COVERAGES                                         LIMIT OF LIABILITY

SECTION I

A.  DWELLING                                              $    258,000
B.  OTHER STRUCTURES                                      $     25,800
C.  PERSONAL PROPERTY                                     $    180,600
D.  LOSS OF USE                                           $     51,600

SECTION II

E.  PERSONAL LIABILITY:  EACH OCCURRENCE                  $    300,000
F.  MEDICAL PAYMENTS TO OTHERS:  EACH PERSON              $      1,000

---

DEDUCTIBLE - SECTION I : WE COVER ONLY THAT PART OF A LOSS OVER $   500

---

RATING INFORMATION:
2 FAMILY FRAME DWELLING BUILT IN 1996
STATE 02 TERR. 00048 PROTECTION CLASS 2
FIRE PROTECTION PROVIDER TUCSON
WITHIN 500. FEET OF A FIRE HYDRANT AND WITHIN 2 MILES OF A FIRE STATION
INSIDE CITY LIMITS PREMIUM GROUP 1.00 T 6

COUNTERSIGNED BY   _Kristine R. Gar_                    AUTHORIZED AGENT

----CONTINUED ON PAGE 2-

FORM H-525   (9/03)                                              567

DECLARATIONS (CONTINUED)                POLICY NO. 55 RBC423052

NAMED INSURED: VAIL,CHRIS


FORMS AND ENDORSEMENTS NOW MADE PART OF THIS POLICY:
(ENTRIES ON ENDORSEMENTS MAY BE LEFT BLANK IF SHOWN ELSEWHERE IN THE POLICY)

| | | | | |
|---|---|---|---|---|
| HO 00 03 | 10 00 | SPECIAL FORM | BASIC PREMIUM $ | 1,241.00 |
| HW 01 50 | 10 07 | SPECIAL PROVISIONS - ARIZONA | PREMIUM | NIL |
| HO 04 96 | 10 00 | NO SECT II COV-HOME DAY CARE BUSINESS | PREMIUM | NIL |
| HW 01 03 | 06 03 | AMENDATORY ENDORSEMENT | PREMIUM | NIL |
| HW 01 04 | 06 03 | HOMEOWNERS POLICY POLLUTION EXCLUSION | PREMIUM | NIL |
| HW 05 44 | 04 05 | PROTECTORPLUS ZERO DEDUCTIBLE | PREMIUM | NIL |
| HO 04 16 | 10 00 | PREMISES ALARM OR FIRE PROT. SYSTEM | CREDIT $ | 48.00 |
| | | 4 PERCENT CREDIT | | |
| HO 04 27 | 04 02 | LIMITED FUNGI, ROT OR BACTERIA COV | PREMIUM | NIL |
| | | $5,000 PROPERTY DAMAGE    $50,000 LIABILITY | | |
| HW 04 11 | 06 03 | ADDITIONAL LMTS LIABILITY-COV A,B,C,D | PREMIUM $ | 30.00 |
| | | CAP 1.50 | | |
| HW 01 01 | 06 03 | LIFETIME CONTINUATION AGREEMENT | PREMIUM | NIL |
| HO 04 90 | 10 00 | PERS PROP REPLACEMENT COST LOSS STLMNT | PREMIUM $ | 121.00 |
| HO 04 48 | 10 00 | OTHER STRUCTURES-RESIDENCE PREMISES | PREMIUM $ | 149.00 |
| | | DESCRIPTION: COTTAGE       LIMIT $49,600 | | |
| HO 04 54 | 10 00 | EARTHQUAKE | PREMIUM $ | 105.00 |
| | | THE EXCLUSION APPLIES        ZONE 5 | | |
| | | 5% DEDUCTIBLE APPLIES TO COV A OR COV C | | |
| | | WHICHEVER IS GREATER WITH A $250 MINIMUM | | |
| COVERAGE E OR F INCREASE | | | PREMIUM $ | 11.00 |
| | | NEW FULL TERM PREMIUM | $ | 1,609.00 |

------------------------------------

AUTOMATED LINE  1-800-423-0567          BILLING ID 85384972
PREMIUM WAIVED

- PLEASE NOTE -
07% AGE OF DWELLING CREDIT APPLIES - INCLUDED IN BASIC PREMIUM
20% AUTOMOBILE CREDIT APPLIES - INCLUDED IN BASIC PREMIUM
100% OF THE REPLC COST FOR COVERAGE A
04% RENEWAL CREDIT APPLIES - INCLUDED IN BASIC PREMIUM
THE LIMIT OF LIABILITY FOR SECTION I COVERAGES MAY BE ADJUSTED
ANNUALLY BASED ON THE INFLATION RATE IN YOUR AREA.


FORM H-S25   (Ed. 9/03)              03-28-12 10-15-11 03-29-12      568

## Flood Insurance Notice

This policy does not protect you against loss due to flood. If you haven't already obtained a flood insurance policy and would like information regarding this special coverage please call our toll-free number 1-800-296-7542.   One of our representatives will be happy to assist you.

Form DRH-5-2   (Ed. 2/97)   Printed in U.S.A



# An Important Notice Regarding
## Your Limit of Liability for Section I Coverages

Dear Valued Policyholder,

The limit of Liability for Section I coverages that are listed on the Declarations page of your policy may be adjusted annually based on the inflation rate in your area. In order to be adequately protected, the coverage limit you purchase should reflect the cost to rebuild or replace the dwelling if you incurred a covered loss.

You should check your policy limits periodically to make sure that you have the right amount of coverage. This amount may increase or decrease over time depending on several factors, including construction costs in your area. Significant changes to the structure or quality of the materials in your home will also affect the amount of coverage you should maintain.

It is very important to keep your insured property values accurate. If you have not checked the value of your home in the past year or two, we urge you to do so. For assistance in calculating the replacement cost of your home, you can contact an appraiser in your area, your insurance agent, or one of our trained service representatives.

We understand your home is more than a dwelling to you. To ensure your keepsakes and memories are protected, we encourage you to review your coverage at least every two years. Please feel free to contact us at 1-800-423-0567

PLP-163-0   (Ed. 3/11)



# Notice of Our Insurance Information Practices
## and Privacy Act Notification

This notice applies in: Arizona, California, Connecticut, Georgia, Illinois, Kansas, Maine, Minnesota, Montana, Nevada, New Jersey, North Carolina, Oregon and Virginia.

While your application for insurance is our primary source of information, we may also collect additional information from other sources about you and other persons insured under your policy. Such information will not be disclosed to third parties without your authorization except in connection with our business or as otherwise permitted or required by law, and as set forth in our Privacy Policy and in any Opt-Out Notice we may provide to you. Upon your request, we will send to you a more detailed explanation of our insurance information practices.

You have the right to know what kind of information (except for information collected to evaluate a claim or the possibility of a law suit or misrepresentation exists) we keep in our files about you, to have access to this information, and to obtain a copy. You are entitled to ascertain the identities of persons to whom the information has been disclosed. If you are interested in obtaining information from your file, please write to us and include your complete name, address and policy number. If after reading the information in your file you believe it is incorrect, you should notify us indicating what you believe is incorrect and why. We will reinvestigate the matter and either correct our records or agree to place a statement from you in our files explaining why you believe this information is incorrect. You may make a written request within ninety (90) business days from the date of mailing of this notice to obtain the specific reasons for our eligibility and/or pricing decisions and the source and information relied upon in making such decisions. Your rights under this notice are not abridged or limited by our Privacy Policy.

For Virginia, Arizona and Montana residents, please refer to the enclosed Notice of Our Insurance Information Practices for a more detailed explanation of our information practices and your access and correction rights.

Please send your request to:   AARP INSURANCE PROGRAM
                                THE HARTFORD
                                P O BOX 14219
                                LEXINGTON            KY 40512

PLA-131-0

## NOTICE REGARDING USE OF CONSUMER REPORTS

Thank you for your interest in The Hartford. We value your business and appreciate the trust you have placed in us. We would like to take this opportunity to provide you with some important information. Like most insurers, we use consumer reports obtained from consumer reporting agencies to help us determine the appropriate insurance premium for your policy. In calculating your premium, we used information from the consumer reporting agency listed below. Your premium would have been lower if we had not taken this information into account.

The consumer reporting agency listed below did not make any decisions concerning your premium and is unable to provide you with specific reasons for those decisions. You have the right to obtain a free copy of your consumer report, by making a request within sixty (60) days of receipt of this notice. You should consider obtaining a free copy of your consumer report, and reviewing the information to make sure that it is correct. If you believe your consumer report information is incorrect, you have the right to dispute the accuracy and/or completeness of your consumer report information directly with the consumer reporting agency.

Information was obtained from the following consumer reporting agency:

Trans Union, LLC, 2 Baldwin Place, P.O. Box 1000, Chester, PA, 19022, or call toll free at 1-800-645-1938.    If you wish to access the Trans Union website, you can use the following address: http://www.transunion.com

We look at credit history information, along with a number of other factors, to help us measure your insurance risk; this information does not necessarily reflect your credit worthiness. We look at credit history differently from the way a lender would and this information has proven to be an extremely accurate predictor of future insurance losses. Therefore, it is possible to have a favorable credit score, but still not be eligible for our lowest premium.

The following factors from your credit report had the most significant influence on your insurance score:

RECENT LATE PAYMENTS
YOU OPENED MORE ACCOUNTS THAN IS OPTIMAL
PRESENCE OF COLLECTION ACCOUNTS
THE LENGTH OF YOUR CREDIT HISTORY DOES NOT SUPPORT A LOWER PREMIUM

The insurance company listed on your policy declarations or with your policy quotation material took this action by not issuing or offering you a policy at a lower premium. That company and Hartford Fire Insurance Company took this action in connection with determining your premium. If you would like more detailed information regarding your insurance premium, write to us at Consumer Affairs, P.O. Box 2920, Hartford, CT 06104.

PLA-242-0

### Privacy Policy and Practices of The Hartford Financial Services Group, Inc. and its Affiliates

(herein called "we, our, and us")

*This Privacy Policy applies to our United States Operations*

We value your trust. We are committed to the responsible:

a) management;

b) use; and

c) protection;

of Personal Information.

This notice describes how we collect, disclose, and protect Personal Information.

We collect Personal Information to:

a) service your Transactions with us; and

b) support our business functions.

We may obtain Personal Information from:

a) You;

b) your Transactions with us; and

c) third parties such as a consumer-reporting agency.

Based on the type of product or service You apply for or get from us, Personal Information such as:

a) your name;

b) your address;

c) your income;

d) your payment; or

e) your credit history;

may be gathered from sources such as applications, Transactions, and consumer reports.

To serve You and service our business, we may share certain Personal Information. We will share Personal Information, only as allowed by law, with affiliates such as:

a) our insurance companies;

b) our employee agents;

c) our brokerage firms; and

d) our administrators.

As allowed by law, we may share Personal Financial Information with our affiliates to:

a) market our products; or

b) market our services;

to You without providing You with an option to prevent these disclosures.

We may also share Personal Information, only as allowed by law, with unaffiliated third parties including:

a) independent agents;

b) brokerage firms;

c) insurance companies;

d) administrators; and

e) service providers;

who help us serve You and service our business.

When allowed by law, we may share certain Personal Financial Information with other unaffiliated third parties who assist us by performing services or functions such as:

a) taking surveys;

b) marketing our products or services; or

c) offering financial products or services under a joint agreement between us and one or more financial institutions.

We will not sell or share your Personal Financial Information with anyone for purposes unrelated to our business functions without offering You the opportunity to:

a) "opt-out"; or

b) "opt-in";

as required by law.

We only disclose Personal Health Information with:

a) your proper written authorization; or

b) as otherwise allowed or required by law.

Our employees have access to Personal Information in the course of doing their jobs, such as:

a) underwriting policies;

b) paying claims;

c) developing new products; or

d) advising customers of our products and services.

We use manual and electronic security procedures to maintain:

a) the confidentiality; and

b) the integrity of;

Personal Information that we have. We use these procedures to guard against unauthorized access.

1 of 2

Some techniques we use to protect Personal Information include:

a)  secured files;

b)  user authentication;

c)  encryption;

d)  firewall technology; and

e)  the use of detection software.

We are responsible for and must:

a)  identify information to be protected;

b)  provide an adequate level of protection for that data;

c)  grant access to protected data only to those people who must use it in the performance of their job-related duties.

Employees who violate our Privacy Policy will be subject to discipline, which may include ending their employment with us.

At the start of our business relationship, we will give You a copy of our current Privacy Policy.

We will also give You a copy of our current Privacy Policy once a year if You maintain a continuing business relationship with us.

We will continue to follow our Privacy Policy regarding Personal Information even when a business relationship no longer exists between us.

*As used in this Privacy Notice:*

**Application** means your request for our product or service.

**Personal Financial Information** means financial information such as:

a)  credit history;

b)  income;

c)  financial benefits; or

d)  policy or claim information.

**Personal Health Information** means health information such as:

a)  your medical records; or

b)  information about your illness, disability or injury.

**Personal Information** means information that identifies You personally and is not otherwise available to the public. It includes:

a)  **Personal Financial Information;** and

b)  **Personal Health Information.**

**Transaction** means your business dealings with us, such as:

a)  your Application;

b)  your request for us to pay a claim; and

c)  your request for us to take an action on your account.

**You** means an individual who has given us Personal Information in conjunction with:

a)  asking about;

b)  applying for; or

c)  obtaining;

a financial product or service from us if the product or service is used mainly for personal, family, or household purposes.

This Privacy Policy is being provided on behalf of the following affiliates of The Hartford Financial Services Group, Inc.:

Hartford Accident and Indemnity Company; Hartford Fire General Agency, Inc.; Hartford Fire Insurance Company; Hartford Insurance Company of Illinois; Hartford Insurance Company of the Midwest; Hartford Underwriters Insurance Company; Nutmeg Insurance Agency, Inc.; Nutmeg Insurance Company; Property and Casualty Insurance Company of Hartford; Trumbull Insurance Company; Trumbull Services, L.L.C.;Twin City Fire Insurance Company.

If you have any questions regarding this Privacy Policy or Homeowners insurance, please call us, toll free, at 1-800-423-4114.

If you have any questions regarding this Privacy Policy or Auto insurance, please call us, toll free, at 1-800-541-3717.

DRA-927-6

## Opt-Out Notice For Applicants and Policyholders in the

## AARP Automobile and Homeowners Insurance Program from The Hartford

In addition to the ways we share personal financial information described in our Privacy Policy, we may also share basic participation information such as your name, address, status as an applicant or policyholder, and type of policy, with AARP and AARP's wholly owned subsidiary, AARP Services, Inc. (collectively "AARP"). In addition to using this information to measure member participation and satisfaction with the Program, AARP may use this information for other unrelated purposes, such as analyzing member needs and interests. AARP may also share this information with other AARP service providers in order, for example, to inform you of other member benefits and services that may be of interest to you. AARP service providers may include other financial institutions and retailers, such as life insurers, securities companies, and providers of consumer goods. Before sharing personal information with unaffiliated third parties, except as described in our Privacy Policy, we give affected customers an opportunity to direct that such information not be disclosed. If you would prefer not to have your information shared with AARP for purposes unrelated to the AARP Automobile and Homeowners Insurance Program from the Hartford, you may request this by checking the box below and returning this form to The Hartford.

☐ I do not want my personal information shared by The Hartford with AARP or AARP Services, Inc. for purposes that are unrelated to the AARP Insurance Program with The Hartford (other than as permitted or required by law).

Named Insured(s) or Applicant(s) _____

_____

Street Address _____

. City, State, Zip Code . _____

Home Telephone Number _____

Type of Policy (Automobile, Homeowners, or other)          Policy Number, if issued

Signature          Date Signed

Send to:     The Hartford
             P.O.Box 14219
             Lexington, KY 40512

If there is more than one named insured or applicant, this election can be made by any named insured or applicant and it will apply to all. This election will apply to all policies in the Program and will continue until revoked by you; however, if your relationship with The Hartford is discontinued you will need to resubmit this election if you reapply for coverage. Your request may take up to 6-8 weeks to become effective.

NOTE: As an AARP member, you may still receive mailings from AARP and other providers of AARP member benefits and services even if you do not return this opt-out notice. If you do not wish to receive promotional mailings from other AARP service providers you must instead contact AARP directly by calling 1-888-687-2277.

DRA-928-1

This notice applies to applicants and policyholders of personal lines of property and casualty insurance in the following states: Arizona, California, Connecticut, Georgia, Illinois, Kansas, Maine, Minnesota, Nevada, New Jersey, North Carolina, Oregon, and Virginia.

## NOTICE OF OUR INSURANCE INFORMATION PRACTICES

The Hartford is committed to protecting the privacy and confidentiality of our customer information in accordance with law. We have prepared this notice of our insurance information practices as required by the law in your state. Your rights under this notice are not abridged or limited by our Privacy Policy.

### COLLECTION OF INFORMATION

While the information you provide to us through your application is our primary source of information, we may also collect additional information from others about you and other insured persons to determine your eligibility and premium for insurance. We may obtain information from a consumer reporting agency, motor vehicle department, property inspection company, or agent. Information obtained from these sources may include information about your accident and loss history, motor vehicle violations, the value and condition of your property, and an evaluation of your loss potential through an analysis of credit characteristics, known as an insurance score. Occasionally, we may have someone call at your home to ask about the autos or boats you have and to identify by name, age and gender the operators of any of your insured vehicles or boats, or verify other information on your application or in your policy records.

### HOW INFORMATION IS MAINTAINED

Information about you will be kept in our policy records. We will refer to and use the information for purposes relating to our business, such as settling claims, issuing and servicing insurance policies, and marketing products and services. Information collected for us by consumer reporting agencies will be treated as confidential and will not be given to others except as permitted by law. The consumer reporting agency and insurance support organizations from whom we obtain reports may retain the information and share it with others who use these reports as permitted by law.

### HOW INFORMATION CAN BE DISCLOSED AS PERMITTED BY LAW

We may, as permitted by law, share information about you contained in our files with certain persons or organizations, including the following:

1. persons or organizations who help us with business functions such as an agent, adjuster, appraiser, investigator, attorney, reinsurer, insurance support organization, and companies providing marketing, data processing and other services;

2. persons or organizations that help detect or prevent criminal activity, fraud, material misrepresentation or nondisclosure;

3. a medical professional or institution to verify insurance coverage, to inform you of a medical problem, or to conduct an operation or services audit of the medical professional or institution;

4. an insurance regulatory authority;

5. a law enforcement or other governmental authority to detect, prevent and prosecute fraud or other illegal activities;

6. person or organizations for the purpose of conducting actuarial or research studies;

7. persons or organizations within our affiliated group of companies for the purpose of auditing, or marketing an insurance product or service;

8. persons or organizations of a group policyholder for the purpose of reporting claims experience or to conduct an audit;

9. persons or organizations such as a lienholder, mortgagee, assignee, or other person with a legal or beneficial interest in a policy of insurance;

PLA-52-2

10. as described in our Privacy Policy, and in any opt-out notice we may provide to you;

11. in any other manner that you may authorize us to; and

12. as otherwise permitted or required by law.

## YOUR ACCESS AND CORRECTION RIGHTS

You have the right to know what kind of personal information we keep in our files about you, to have access to this information, and to get a copy, except for information relating to a claim or a civil or criminal proceeding. If requested, we will identify for you the persons or organizations to whom we may have recently disclosed the information and the source of this information, if the source of the information is an institutional source.

If after reading the information in your file, you believe it is incorrect, you may notify us indicating what you believe is incorrect and why. Within 30 business days of our receipt of your written request, we will investigate the matter and either correct our records or agree to place a statement from you in our files explaining why you believe the information is incorrect. If we correct our records, we will provide, at your request, your corrected information to (1) any person who has, within the past two years, received information from our files, (2) any insurance support organization that has received information from our files within the past seven years, provided that organization still maintains your personal information, and (3) any insurance support organization that provided us with your information that has been corrected.

If you are interested in obtaining information from our files, please write to us. We will need your complete name, address and all policy numbers under which you are insured. Tell us what information you would like to receive. If you ask for copies of your records, there may be a nominal charge.

We will also give you the name and address of any consumer reporting agency who may have prepared any report in our files about you. You may obtain a copy of your report directly from them. If you believe the report is incorrect, you should contact them directly so that they can reinvestigate their information. Any corrections made by them will then be given to us.

2 of 2

PLA-52-2



# The Hartford
# Homeowners 3
# Insurance Policy
# Special Form

## NOTICE !

THIS POLICY DOES NOT COVER
FLOOD LOSS OR DAMAGE.

CALL YOUR HARTFORD INSURANCE
REPRESENTATIVE LISTED ON THE
ENCLOSED DECLARATIONS PAGE TO
OBTAIN A FLOOD INSURANCE POLICY.

# HOMEOWNERS POLICY COVER SHEET

Your Homeowners Insurance policy is a legal contract between you and us.

**READ YOUR POLICY CAREFULLY.** This cover sheet provides only a brief outline of some of the important features of your policy. This is not the insurance contract and only the actual policy provisions will control. The policy itself sets forth in detail the rights and obligations of both you and your insurance company. IT IS THEREFORE IMPORTANT THAT YOU READ YOUR POLICY.

The following is an index of the major provisions of your policy. Page numbers refer to the location of these provisions in the policy. Amendatory endorsements may be attached to your policy to modify these provisions or provide you with additional coverage(s).

## INDEX OF MAJOR
## PROVISIONS OF THE POLICY

Beginning
On Page

| DECLARATION PAGE | Your Name | Coverages |
| | Location of Your Residence | Amount of Insurance |
| | Policy Period | Deductible |

AGREEMENT..............................................................................1

DEFINITIONS..........................................................................1

SECTION I – PROPERTY COVERAGES.................................4

Property Coverages       Credit Card
Loss of Use              Loss Assessment
Additional Coverages     Collapse
Debris Removal           Glass or Safety Glazing Material
Reasonable Pair or Set   Landlord's Furnishings
Trees Shrubs and Other Plants   Ordinance or Law
Fire Department Service Charge   Grave Markers
Property Removed

SECTION I – PERILS INSURED AGAINST.............................15

SECTION I – EXCLUSIONS................................................20

HO 00 03 10 00

**SECTION I – CONDITIONS**........................................................................23

| | |
|---|---|
| Insurable Interest | Abandonment of Property |
| Duties after a Loss | Mortgage Clause |
| Loss Settlement | No Benefit to Bailee |
| Loss to a Repair or Set | Nuclear Hazard Clause |
| Appraisal | Recovered Property |
| Other Insurance and Service | Volcanic Eruption Period |
| Agreement | Concealment of Fraud |
| Suit Against Us | Loss Payable Clause |
| Loss Payment | |

**SECTION II – LIABILITY COVERAGES**........................................................29

| |
|---|
| Personal Liability |
| Medical Payments to Others |

**SECTION II – EXCLUSIONS**........................................................................30

**SECTION II – ADDITIONAL COVERAGES**...................................................35

| | |
|---|---|
| Claim Expenses | Damage of Property of Others |
| First Aid Expenses | Loss Assessment |

**SECTION II – CONDITIONS**........................................................................37

| | |
|---|---|
| Limit of Liability | Suit Against Us |
| Severability of Insurance | Bankruptcy of an Insured |
| Duties After Occurance | Other Insurance |
| Duties of an Injured Person | Policy Period |
| Payment of Claim | Concealment or Fraud |

**SECTIONS I & II – CONDITIONS**................................................................39

| | |
|---|---|
| Liberalization Clause | Non-Renwal |
| Waiver or Changes of Policy | Assignment |
| Provisions | Subrogation |
| Cancellation | Death |

# HOMEOWNERS 3 – SPECIAL FORM

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

A. In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance.

B. In addition, certain words and phrases are defined as follows:

1. "Aircraft Liability", "Hovercraft Liability", "Motor Vehicle Liability" and "Watercraft Liability", subject to the provisions in b. below, mean the following:

   a. Liability for "bodily injury" or "property damage" arising out of the:

      (1) Ownership of such vehicle or craft by an "insured";

      (2) Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

      (3) Entrustment of such vehicle or craft by an "insured" to any person;

      (4) Failure to supervise or negligent supervision of any person involving such vehicle or craft by an "insured"; or

      (5) Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

   b. For the purpose of this definition:

      (1) Aircraft means any contrivance used or designed for flight except model or hobby aircraft not used or designed to carry people or cargo;

      (2) Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

      (3) Watercraft means a craft principally designed to be propelled on or in water by wind, engine power or electric motor; and

      (4) Motor vehicle means a "motor vehicle" as defined in 7. below.

2. "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

3. "Business" means:

   a. A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

   b. Any other activity engaged in for money or other compensation, except the following:

HO 00 03 10 00          Page 1 of 41

    (1) One or more activities, not described in (2) through (4) below, for which no "insured" receives more than $2,000 in total compensation for the 12 months before the beginning of the policy period;

    (2) Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

    (3) Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

    (4) The rendering of home day care services to a relative of an "insured".

4. "Employee" means an employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, whose duties are other than those performed by a "residence employee".

5. "Insured" means:

  a. You and residents of your household who are:

    (1) Your relatives; or

    (2) Other persons under the age of 21 and in the care of any person named above;

  b. A student enrolled in school full time, as defined by the school, who was a resident of your household before moving out to attend school, provided the student is under the age of:

    (1) 24 and your relative; or

    (2) 21 and in your care or the care of a person described in a.(1) above; or

  c. Under Section II:

    (1) With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in a. or b. above. "Insured" does not mean a person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner; or

    (2) With respect to a "motor vehicle" to which this policy applies:

      (a) Persons while engaged in your employ or that of any person included in a. or b. above; or

      (b) Other persons using the vehicle on an "insured location" with your consent.

Under both Sections I and II, when the word an immediately precedes the word "insured", the words an "insured" together mean one or more "insureds".

6. "Insured location" means:

a. The "residence premises";

b. The part of other premises, other structures and grounds used by you as a residence; and

   (1) Which is shown in the Declarations; or

   (2) Which is acquired by you during the policy period for your use as a residence;

c. Any premises used by you in connection with a premises described in a. and b. above;

d. Any part of a premises:

   (1) Not owned by an "insured"; and

   (2) Where an "insured" is temporarily residing;

e. Vacant land, other than farm land, owned by or rented to an "insured";

f. Land owned by or rented to an "insured" on which a one, two, three or four family dwelling is being built as a residence for an "insured";

g. Individual or family cemetery plots or burial vaults of an "insured"; or

h. Any part of a premises occasionally rented to an "insured" for other than "business" use.

7. "Motor vehicle" means:

a. A self-propelled land or amphibious vehicle; or

b. Any trailer or semitrailer which is being carried on, towed by or hitched for towing by a vehicle described in a. above.

8. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

a. "Bodily injury"; or

b. "Property damage".

9. "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

10. "Residence employee" means:

a. An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm, under an agreement between an "insured" and the labor leasing firm, whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

HO 00 03 10 00          Page 3 of 41

    b.  One who performs similar duties elsewhere not related to the "business" of an "insured".

A "residence employee" does not include a temporary employee who is furnished to an "insured" to substitute for a permanent "residence employee" on leave or to meet seasonal or short-term workload conditions.

11.  "Residence premises" means:

    a.  The one family dwelling where you reside;

    b.  The two, three or four family dwelling where you reside in at least one of the family units; or

    c.  That part of any other building where you reside;

and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

**DEDUCTIBLE**

Unless otherwise noted in this policy, the following deductible provision applies:

Subject to the policy limits that apply, we will pay only that part of the total of all loss payable under Section I that exceeds the deductible amount shown in the Declarations.

---

**SECTION I – PROPERTY COVERAGES**

---

**A. Coverage A – Dwelling**

  1.  We cover:

    a.  The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

    b.  Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

  2.  We do not cover land, including land on which the dwelling is located.

**B. Coverage B – Other Structures**

  1.  We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

  2.  We do not cover:

    a.  Land, including land on which the other structures are located;

    b.  Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage;

    c.  Other structures from which any "business" is conducted; or

HO 00 03 10 00        Page 4 of 41

    d. Other structures used to store "business" property. However, we do cover a structure that contains "business" property solely owned by an "insured" or a tenant of the dwelling provided that "business" property does not include gaseous or liquid fuel, other than fuel in a permanently installed fuel tank of a vehicle or craft parked or stored in the structure.

3. The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

**C. Coverage C – Personal Property**

1. **Covered Property**

We cover personal property owned or used by an "insured" while it is anywhere in the world. After a loss and at your request, we will cover personal property owned by:

a. Others while the property is on the part of the "residence premises" occupied by an "insured"; or

b. A guest or a "residence employee", while the property is in any residence occupied by an "insured".

2. **Limit For Property At Other Residences**

Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises", is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater. However, this limitation does not apply to personal property:

a. Moved from the "residence premises" because it is being repaired, renovated or rebuilt and is not fit to live in or store property in; or

b. In a newly acquired principal residence for 30 days from the time you begin to move the property there.

3. **Special Limits Of Liability**

The special limit for each category shown below is the total limit for each loss for all property in that category. These special limits do not increase the Coverage C limit of liability.

a. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, medals, scrip, stored value cards and smart cards.

b. $1,500 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

This limit includes the cost to research, replace or restore the information from the lost or damaged material.

c. $1,500 on watercraft of all types, including their trailers, furnishings, equipment and outboard engines or motors.

d. $1,500 on trailers or semitrailers not used with watercraft of all types.

e. $1,500 for loss by theft of jewelry, watches, furs, precious and semiprecious stones.

f. $2,500 for loss by theft of firearms and related equipment.

g. $2,500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

h. $2,500 on property, on the "residence premises", used primarily for "business" purposes.

i. $500 on property, away from the "residence premises", used primarily for "business" purposes. However, this limit does not apply to loss to electronic apparatus and other property described in Categories j. and k. below.

j. $1,500 on electronic apparatus and accessories, while in or upon a "motor vehicle", but only if the apparatus is equipped to be operated by power from the "motor vehicle's" electrical system while still capable of being operated by other power sources.

Accessories include antennas, tapes, wires, records, discs or other media that can be used with any apparatus described in this Category j.

k. $1,500 on electronic apparatus and accessories used primarily for "business" while away from the "residence premises" and not in or upon a "motor vehicle". The apparatus must be equipped to be operated by power from the "motor vehicle's" electrical system while still capable of being operated by other power sources.

Accessories include antennas, tapes, wires, records, discs or other media that can be used with any apparatus described in this Category k.

4. **Property Not Covered**

We do not cover:

a. Articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

b. Animals, birds or fish;

c. "Motor vehicles".

(1) This includes:

(a) Their accessories, equipment and parts; or

(b) Electronic apparatus and accessories designed to be operated solely by power from the electrical system of the "motor vehicle". Accessories include antennas, tapes, wires, records, discs or other media that can be used with any apparatus described above.

The exclusion of property described in (a) and (b) above applies only while such property is in or upon the "motor vehicle".

(2) We do cover "motor vehicles" not required to be registered for use on public roads or property which are:

(a) Used solely to service an "insured's" residence; or

(b) Designed to assist the handicapped;

d. Aircraft meaning any contrivance used or designed for flight including any parts whether or not attached to the aircraft.

We do cover model or hobby aircraft not used or designed to carry people or cargo;

e. Hovercraft and parts. Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

f. Property of roomers, boarders and other tenants, except property of roomers and boarders related to an "insured";

g. Property in an apartment regularly rented or held for rental to others by an "insured", except as provided in E.10. Landlord's Furnishings under Section I – Property Coverages;

h. Property rented or held for rental to others off the "residence premises";

i. "Business" data, including such data stored in:

(1) Books of account, drawings or other paper records; or

(2) Computers and related equipment.

We do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market;

j. Credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds except as provided in E.6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I – Property Coverages; or

k. Water or steam.

D. **Coverage D – Loss Of Use**

The limit of liability for Coverage D is the total limit for the coverages in 1. Additional Living Expense, 2. Fair Rental Value and 3. Civil Authority Prohibits Use below.

1. **Additional Living Expense**

If a loss covered under Section I makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. **Fair Rental Value**

If a loss covered under Section I makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in.

Payment will be for the shortest time required to repair or replace such premises.

3. **Civil Authority Prohibits Use**

If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against, we cover the loss as provided in 1. Additional Living Expense and 2. Fair Rental Value above for no more than two weeks.

4. **Loss Or Expense Not Covered**

We do not cover loss or expense due to cancellation of a lease or agreement.

The periods of time under 1. Additional Living Expense, 2. Fair Rental Value and 3. Civil Authority Prohibits Use above are not limited by expiration of this policy.

E. **Additional Coverages**

1. **Debris Removal**

a. We will pay your reasonable expense for the removal of:

(1) Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

(2) Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

HO 00 03 10 00          Page 8 of 41

This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit is available for such expense.

b. We will also pay your reasonable expense, up to $1,000, for the removal from the "residence premises" of:

(1) Your tree(s) felled by the peril of Windstorm or Hail or Weight of Ice, Snow or Sleet; or

(2) A neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

provided the tree(s):

(3) Damage(s) a covered structure; or

(4) Does not damage a covered structure, but:

(a) Block(s) a driveway on the "residence premises" which prevent(s) a "motor vehicle", that is registered for use on public roads or property, from entering or leaving the "residence premises"; or

(b) Block(s) a ramp or other fixture designed to assist a handicapped person to enter or leave the dwelling building.

The $1,000 limit is the most we will pay in any one loss regardless of the number of fallen trees. No more than $500 of this limit will be paid for the removal of any one tree.

This coverage is additional insurance.

2. **Reasonable Repairs**

a. We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

b. If the measures taken involve repair to other damaged property, we will only pay if that property is covered under this policy and the damage is caused by a Peril Insured Against. This coverage does not:

(1) Increase the limit of liability that applies to the covered property; or

(2) Relieve you of your duties, in case of a loss to covered property, described in B.4. under Section I – Conditions.

3. **Trees, Shrubs And Other Plants**

We cover trees, shrubs, plants or lawns, on the "residence premises", for loss caused by the following Perils Insured Against:

a. Fire or Lightning;

HO 00 03 10 00                     Page 9 of 41

b. Explosion;

c. Riot or Civil Commotion;

d. Aircraft;

e. Vehicles not owned or operated by a resident of the "residence premises";

f. Vandalism or Malicious Mischief; or

g. Theft.

We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be paid for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

This coverage is additional insurance.

4. **Fire Department Service Charge**

We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed**

We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed.

This coverage does not change the limit of liability that applies to the property being removed.

6. **Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money**

a. We will pay up to $500 for:

(1) The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

(2) Loss resulting from theft or unauthorized use of an electronic fund transfer card or access device used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

(3) Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

(4) Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

HO 00 03 10 00             Page 10 of 41

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

This coverage is additional insurance. No deductible applies to this coverage.

b. We do not cover:

(1) Use of a credit card, electronic fund transfer card or access device:

(a) By a resident of your household;

(b) By a person who has been entrusted with either type of card or access device; or

(c) If an "insured" has not complied with all terms and conditions under which the cards are issued or the devices accessed; or

(2) Loss arising out of "business" use or dishonesty of an "insured".

c. If the coverage in a. above applies, the following defense provisions also apply:

(1) We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

(2) If a suit is brought against an "insured" for liability under a.(1) or (2) above, we will provide a defense at our expense by counsel of our choice.

(3) We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under a.(3) above.

**7. Loss Assessment**

a. We will pay up to $1,000 for your share of loss assessment charged during the policy period against you, as owner or tenant of the "residence premises", by a corporation or association of property owners. The assessment must be made as a result of direct loss to property, owned by all members collectively, of the type that would be covered by this policy if owned by you, caused by a Peril Insured Against under Coverage A, other than:

(1) Earthquake; or

(2) Land shock waves or tremors before, during or after a volcanic eruption.

The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments. We will only apply one deductible, per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments.

b. We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

c. Paragraph P. Policy Period under Section I – Conditions does not apply to this coverage.

This coverage is additional insurance.

8. **Collapse**

a. With respect to this Additional Coverage:

(1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settlingn,shrinkage,or expansion.

b. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

(1) The Perils Insured Against named under Coverage C;

(2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

(3) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

(4) Weight of contents, equipment, animals or people;

(5) Weight of rain which collects on a roof; or

(6) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

c. Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under b.(2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.

d. This coverage does not increase the limit of liability that applies to the damaged covered property.

9. **Glass Or Safety Glazing Material**

a. We cover:

(1) The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

(2) The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window when caused directly by earth movement; and

(3) The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

b. This coverage does not include loss:

(1) To covered property which results because the glass or safety glazing material has been broken, except as provided in a.(3) above; or

(2) On the "residence premises" if the dwelling has been vacant for more than 60 consecutive days immediately before the loss, except when the breakage results directly from earth movement as provided in a.(2) above. A dwelling being constructed is not considered vacant.

c. This coverage does not increase the limit of liability that applies to the damaged property.

10. **Landlord's Furnishings**

We will pay up to $2,500 for your appliances, carpeting and other household furnishings, in each apartment on the "residence premises" regularly rented or held for rental to others by an "insured", for loss caused by a Peril Insured Against in Coverage C, other than Theft.

This limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

This coverage does not increase the limit of liability applying to the damaged property.

11. **Ordinance Or Law**

   a. You may use up to 10% of the limit of liability that applies to Coverage **A** for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

     (1) The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

     (2) The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

     (3) The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

   b. You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in a. above.

   c. We do not cover:

     (1) The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

     (2) The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

     Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

   This coverage is additional insurance.

12. **Grave Markers**

   We will pay up to $5,000 for grave markers, including mausoleums, on or away from the "residence premises" for loss caused by a Peril Insured Against under Coverage **C**.

   This coverage does not increase the limits of liability that apply to the damaged covered property.

HO 00 03 10 00          Page 14 of 41

## SECTION I – PERILS INSURED AGAINST

A. Coverage A – Dwelling And Coverage B -- Other Structures

1. We insure against risk of direct physical loss to property described in Coverages A and B.

2. We do not insure, however, for loss:

   a. Excluded under Section I – Exclusions;

   b. Involving collapse, except as provided in E.8. Collapse under Section I – Property Coverages; or

   c. Caused by:

      (1) Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This provision does not apply if you have used reasonable care to:

         (a) Maintain heat in the building; or

         (b) Shut off the water supply and drain all systems and appliances of water.

         However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

         For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

      (2) Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

         (a) Fence, pavement, patio or swimming pool;

         (b) Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building, or other structure;

         (c) Retaining wall or bulkhead that does not support all or part of a building or other structure; or

         (d) Pier, wharf or dock;

      (3) Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

HO 00 03 10 00          Page 15 of 41

(4) Vandalism and malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

(5) Mold, fungus or wet rot. However, we do insure for loss caused by mold, fungus or wet rot that is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure if such loss results from the accidental discharge or overflow of water or steam from within:

 (a) A plumbing, heating, air conditioning or automatic fire protective sprinkler system, or a household appliance, on the "residence premises"; or

 (b) A storm drain, or water, steam or sewer pipes, off the "residence premises".

 For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment; or

(6) Any of the following:

 (a) Wear and tear, marring, deterioration;

 (b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

 (c) Smog, rust or other corrosion, or dry rot;

 (d) Smoke from agricultural smudging or industrial operations;

 (e) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C.

 Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

 (f) Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

 (g) Birds, vermin, rodents, or insects; or

 (h) Animals owned or kept by an "insured".

HO 00 03 10 00          Page 16 of 41

**Exception To c.(6)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage A or B resulting from an accidental discharge or overflow of water or steam from within a:

(i) Storm drain, or water, steam or sewer pipe, off the "residence premises"; or

(ii) Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

Section I – Exclusion A.3. Water Damage, Paragraphs a. and c. that apply to surface water and water below the surface of the ground do not apply to loss by water covered under c.(5) and (6) above.

Under 2.b. and c. above, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

**B. Coverage C – Personal Property**

We insure for direct physical loss to the property described in Coverage C caused by any of the following perils unless the loss is excluded in Section I – Exclusions.

**1. Fire Or Lightning**

**2. Windstorm Or Hail**

This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

3. Explosion
4. Riot Or Civil Commotion
5. Aircraft

This peril includes self-propelled missiles and spacecraft.

6. Vehicles
7. Smoke

This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. Vandalism Or Malicious Mischief
9. Theft

a. This peril includes attempted theft and loss of property from a known place when it is likely that the property has been stolen.

b. This peril does not include loss caused by theft:

(1) Committed by an "insured";

(2) In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

(3) From that part of a "residence premises" rented by an "insured" to someone other than another "insured"; or

(4) That occurs off the "residence premises" of:

(a) Trailers, semitrailers and campers;

(b) Watercraft of all types, and their furnishings, equipment and outboard engines or motors; or

(c) Property while at any other residence owned by, rented to, or occupied by an "insured", except while an "insured" is temporarily living there. Property of an "insured" who is a student is covered while at the residence the student occupies to attend school as long as the student has been there at any time during the 60 days immediately before the loss.

10. Falling Objects

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

HO 00 03 10 00          Page 18 of 41

**11. Weight Of Ice, Snow Or Sleet**

This peril means weight of ice, snow or sleet which causes damage to property contained in a building.

**12. Accidental Discharge Or Overflow Of Water Or Steam**

a. This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

b. This peril does not include loss:

(1) To the system or appliance from which the water or steam escaped;

(2) Caused by or resulting from freezing except as provided in Peril Insured Against 14. Freezing;

(3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises"; or

(4) Caused by mold, fungus or wet rot unless hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

c. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

d. Section I – Exclusion A.3. Water Damage, Paragraphs a. and c. that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

**13. Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging**

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

**14. Freezing**

a. This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

b. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

**15. Sudden And Accidental Damage From Artificially Generated Electrical Current**

This peril does not include loss to tubes, transistors, electronic components or circuitry that are a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

**16. Volcanic Eruption**

This peril does not include loss caused by earthquake, land shock waves or tremors.

---

## SECTION I – EXCLUSIONS

A. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

1. **Ordinance Or Law**

   Ordinance Or Law means any ordinance or law:

   a. Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion A.1.a. does not apply to the amount of coverage that may be provided for in E.11. Ordinance Or Law under Section I – Property Coverages;

   b. The requirements of which result in a loss in value to property; or

   c. Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

   Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

   This Exclusion A.1. applies whether or not the property has been physically damaged.

HO 00 03 10 00          Page 20 of 41

**2. Earth Movement**

Earth Movement means:

a. Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

b. Landslide, mudslide or mudflow;

c. Subsidence or sinkhole; or

d. Any other earth movement including earth sinking, rising or shifting;

caused by or resulting from human or animal forces or any act of nature unless direct loss by fire or explosion ensues and then we will pay only for the ensuing loss.

This Exclusion A.2. does not apply to loss by theft.

**3. Water Damage**

Water Damage means:

a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

b. Water or water-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment; or

c. Water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure;

caused by or resulting from human or animal forces or any act of nature.

Direct loss by fire, explosion or theft resulting from water damage is covered.

**4. Power Failure**

Power Failure means the failure of power or other utility service if the failure takes place off the "residence premises". But if the failure results in a loss, from a Peril Insured Against on the "residence premises", we will pay for the loss caused by that peril.

**5. Neglect**

Neglect means neglect of an "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

**6. War**

War includes the following and any consequence of any of the following:

a. Undeclared war, civil war, insurrection, rebellion or revolution;

b. Warlike act by a military force or military personnel; or

c. Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

**7. Nuclear Hazard**

This Exclusion A.7. pertains to Nuclear Hazard to the extent set forth in M. Nuclear Hazard Clause under Section I – Conditions.

**8. Intentional Loss**

Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

**9. Governmental Action**

Governmental Action means the destruction, confiscation or seizure of property described in Coverage A, B or C by order of any governmental or public authority.

This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

**B.** We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

1. Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in A. above to produce the loss.

2. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

3. Faulty, inadequate or defective:

a. Planning, zoning, development, surveying, siting;

b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. Materials used in repair, construction, renovation or remodeling; or

d. Maintenance;

of part or all of any property whether on or off the "residence premises".

## SECTION I – CONDITIONS

**A. Insurable Interest And Limit Of Liability**

Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

1. To an "insured" for more than the amount of such "insured's" interest at the time of loss; or

2. For more than the applicable limit of liability.

**B. Duties After Loss**

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:

1. Give prompt notice to us or our agent;

2. Notify the police in case of loss by theft;

3. Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in E.6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I – Property Coverages;

4. Protect the property from further damage. If repairs to the property are required, you must:

   a. Make reasonable and necessary repairs to protect the property; and

   b. Keep an accurate record of repair expenses;

5. Cooperate with us in the investigation of a claim;

6. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

7. As often as we reasonably require:

   a. Show the damaged property;

   b. Provide us with records and documents we request and permit us to make copies; and

   c. Submit to examination under oath, while not in the presence of another "insured", and sign the same;

HO 00 03 10 00          Page 23 of 41

8. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

   a. The time and cause of loss;

   b. The interests of all "insureds" and all others in the property involved and all liens on the property;

   c. Other insurance which may cover the loss;

   d. Changes in title or occupancy of the property during the term of the policy;

   e. Specifications of damaged buildings and detailed repair estimates;

   f. The inventory of damaged personal property described in 6. above;

   g. Receipts for additional living expenses incurred and records that support the fair rental value loss; and

   h. Evidence or affidavit that supports a claim under E.6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I – Property Coverages, stating the amount and cause of loss.

C. Loss Settlement

   In this Condition C., the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in E.11. Ordinance Or Law under Section I – Property Coverages. Covered property losses are settled as follows:

   1. Property of the following types:

      a. Personal property;

      b. Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

      c. Structures that are not buildings; and

      d. Grave markers, including mausoleums;

      at actual cash value at the time of loss but not more than the amount required to repair or replace.

   2. Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

a. If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

(1) The limit of liability under this policy that applies to the building;

(2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

(3) The necessary amount actually spent to repair or replace the damaged building.

If the building is rebuilt at a new premises, the cost described in (2) above is limited to the cost which would have been incurred if the building had been built at the original premises.

b. If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(1) The actual cash value of that part of the building damaged; or

(2) That proportion of the cost to repair or replace, after application of any deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

c. To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

(1) Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

(2) Those supports described in (1) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

(3) Underground flues, pipes, wiring and drains.

d. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in 2.a. and b. above.

However, if the cost to repair or replace the damage is both:

(1) Less than 5% of the amount of insurance in this policy on the building; and

(2) Less than $2,500;

we will settle the loss as noted in 2.a. and b. above whether or not actual repair or replacement is complete.

e. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition C. Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

**D. Loss To A Pair Or Set**

In case of loss to a pair or set we may elect to:

1. Repair or replace any part to restore the pair or set to its value before the loss; or

2. Pay the difference between actual cash value of the property before and after the loss.

**E. Appraisal**

If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

1. Pay its own appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

**F. Other Insurance And Service Agreement**

If a loss covered by this policy is also covered by:

1. Other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss; or

2. A service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement means a service plan, property restoration plan, home warranty or other similar service warranty agreement, even if it is characterized as insurance.

**G. Suit Against Us**

No action can be brought against us unless there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of loss.

**H. Our Option**

If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

**I. Loss Payment**

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

1. Reach an agreement with you;

2. There is an entry of a final judgment; or

3. There is a filing of an appraisal award with us.

**J. Abandonment Of Property**

We need not accept any property abandoned by an "insured".

**K. Mortgage Clause**

1. If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

2. If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

   a. Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

   b. Pays any premium due under this policy on demand if you have neglected to pay the premium; and

   c. Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Paragraphs E. Appraisal, G. Suit Against Us and I. Loss Payment under Section I – Conditions also apply to the mortgagee.

3. If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

4. If we pay the mortgagee for any loss and deny payment to you;

HO 00 03 10 00                Page 27 of 41

   a. We are subrogated to all the rights of the mortgagee granted
      under the mortgage on the property; or

   b. At our option, we may pay to the mortgagee the whole principal
      on the mortgage plus any accrued interest. In this event, we will
      receive a full assignment and transfer of the mortgage and all
      securities held as collateral to the mortgage debt.

5. Subrogation will not impair the right of the mortgagee to recover the
   full amount of the mortgagee's claim.

**L. No Benefit To Bailee**

We will not recognize any assignment or grant any coverage that
benefits a person or organization holding, storing or moving property for
a fee regardless of any other provision of this policy.

**M. Nuclear Hazard Clause**

1. "Nuclear Hazard" means any nuclear reaction, radiation, or
   radioactive contamination, all whether controlled or uncontrolled or
   however caused, or any consequence of any of these.

2. Loss caused by the nuclear hazard will not be considered loss
   caused by fire, explosion, or smoke, whether these perils are
   specifically named in or otherwise included within the Perils Insured
   Against.

3. This policy does not apply under Section I to loss caused directly or
   indirectly by nuclear hazard, except that direct loss by fire resulting
   from the nuclear hazard is covered.

**N. Recovered Property**

If you or we recover any property for which we have made payment
under this policy, you or we will notify the other of the recovery. At your
option, the property will be returned to or retained by you or it will
become our property. If the recovered property is returned to or
retained by you, the loss payment will be adjusted based on the amount
you received for the recovered property.

**O. Volcanic Eruption Period**

One or more volcanic eruptions that occur within a 72 hour period will
be considered as one volcanic eruption.

**P. Policy Period**

This policy applies only to loss which occurs during the policy period.

**Q. Concealment Or Fraud**

We provide coverage to no "insureds" under this policy if, whether
before or after a loss, an "insured" has:

1. Intentionally concealed or misrepresented any material fact or
   circumstance;

2. Engaged in fraudulent conduct; or

HO 00 03 10 00          Page 28 of 41

3. Made false statements;

relating to this insurance.

**R. Loss Payable Clause**

If the Declarations show a loss payee for certain listed insured personal property, the definition of "insured" is changed to include that loss payee with respect to that property.

If we decide to cancel or not renew this policy, that loss payee will be notified in writing.

---

## SECTION II – LIABILITY COVERAGES

**A. Coverage E – Personal Liability**

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

**B. Coverage F – Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees". As to others, this coverage applies only:

1. To a person on the "insured location" with the permission of an "insured"; or

2. To a person off the "insured location", if the "bodily injury":

   a. Arises out of a condition on the "insured location" or the ways immediately adjoining;

   b. Is caused by the activities of an "insured";

   c. Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

   d. Is caused by an animal owned by or in the care of an "insured".

HO 00 03 10 00                   Page 29 of 41

## SECTION II -- EXCLUSIONS

**A. "Motor Vehicle Liability"**

1. Coverages E and F do not apply to any "motor vehicle liability" if, at the time and place of an "occurrence", the involved "motor vehicle":

    a. Is registered for use on public roads or property;

    b. Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the "occurrence"; or

    c. Is being:

        (1) Operated in, or practicing for, any prearranged or organized race, speed contest or other competition;

        (2) Rented to others;

        (3) Used to carry persons or cargo for a charge; or

        (4) Used for any "business" purpose except for a motorized golf cart while on a golfing facility.

2. If Exclusion A.1. does not apply, there is still no coverage for "motor vehicle liability" unless the "motor vehicle" is:

    a. In dead storage on an "insured location";

    b. Used solely to service an "insured's" residence;

    c. Designed to assist the handicapped and, at the time of an "occurrence", it is:

        (1) Being used to assist a handicapped person; or

        (2) Parked on an "insured location";

    d. Designed for recreational use off public roads and:

        (1) Not owned by an "insured"; or

        (2) Owned by an "insured" provided the "occurrence" takes place on an "insured location" as defined in Definitions **B. 6.a., b., d., e.** or **h.**; or

    e. A motorized golf cart that is owned by an "insured", designed to carry up to 4 persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and, at the time of an "occurrence", is within the legal boundaries of:

        (1) A golfing facility and is parked or stored there, or being used by an "insured" to:

            (a) Play the game of golf or for other recreational or leisure activity allowed by the facility;

            (b) Travel to or from an area where "motor vehicles" or golf carts are parked or stored; or

HO 00 03 10 00            Page 30 of 41

        (c) Cross public roads at designated points to access other parts of the golfing facility; or

    (2) A private residential community, including its public roads upon which a motorized golf cart can legally travel, which is subject to the authority of a property owners association and contains an "insured's" residence.

**B.** "Watercraft Liability"

1. Coverages E and F do not apply to any "watercraft liability" if, at the time of an "occurrence", the involved watercraft is being:

    a. Operated in, or practicing for, any prearranged or organized race, speed contest or other competition. This exclusion does not apply to a sailing vessel or a predicted log cruise:

    b. Rented to others;

    c. Used to carry persons or cargo for a charge; or

    d. Used for any "business" purpose.

2. If Exclusion B.1. does not apply, there is still no coverage for "watercraft liability" unless, at the time of the "occurrence", the watercraft:

    a. Is stored;

    b. Is a sailing vessel, with or without auxiliary power, that is:

        (1) Less than 26 feet in overall length; or

        (2) 26 feet or more in overall length and not owned by or rented to an "insured"; or

    c. Is not a sailing vessel and is powered by:

        (1) An inboard or inboard-outdrive engine or motor, including those that power a water jet pump, of:

            (a) 50 horsepower or less and not owned by an "insured"; or

            (b) More than 50 horsepower and not owned by or rented to an "insured"; or

        (2) One or more outboard engines or motors with:

            (a) 25 total horsepower or less;

            (b) More than 25 horsepower if the outboard engine or motor is not owned by an "insured";

            (c) More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it during the policy period; or

            (d) More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it before the policy period, but only if:

HO 00 03 10 00         Page 31 of 41

(i) You declare them at policy inception; or

(ii) Your intent to insure them is reported to us in writing within 45 days after you acquire them.

The coverages in **(c)** and **(d)** above apply for the policy period.

Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

**C. "Aircraft Liability"**

This policy does not cover "aircraft liability".

**D. "Hovercraft Liability"**

This policy does not cover "hovercraft liability".

**E. Coverage E – Personal Liability And Coverage F – Medical Payments To Others**

Coverages E and F do not apply to the following:

1. **Expected Or Intended Injury**

   "Bodily injury" or "property damage" which is expected or intended by an "insured" even if the resulting "bodily injury" or "property damage":

   a. Is of a different kind, quality or degree than initially expected or intended; or

   b. Is sustained by a different person, entity, real or personal property, than initially expected or intended.

   However, this Exclusion E.1. does not apply to "bodily injury" resulting from the use of reasonable force by an "insured" to protect persons or property;

2. **"Business"**

   a. "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

   This Exclusion E.2. applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

   b. This Exclusion E.2. does not apply to:

      (1) The rental or holding for rental of an "insured location";

         (a) On an occasional basis if used only as a residence;

HO 00 03 10 00          Page 32 of 41

(b) In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

(c) In part, as an office, school, studio or private garage; and

(2) An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees;

### 3. Professional Services

"Bodily injury" or "property damage" arising out of the rendering of or failure to render professional services;

### 4. "Insured's" Premises Not An "Insured Location"

"Bodily injury" or "property damage" arising out of a premises:

a.  Owned by an "insured";

b.  Rented to an "insured"; or

c.  Rented to others by an "insured";

that is not an "insured location";

### 5. War

"Bodily injury" or "property damage" caused directly or indirectly by war, including the following and any consequence of any of the following:

a.  Undeclared war, civil war, insurrection, rebellion or revolution;

b.  Warlike act by a military force or military personnel; or

c.  Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

### 6. Communicable Disease

"Bodily injury" or "property damage" which arises out of the transmission of a communicable disease by an "insured";

### 7. Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse

"Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse; or

### 8. Controlled Substance

"Bodily injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

Exclusions A. "Motor Vehicle Liability", B. "Watercraft Liability", C. "Aircraft Liability", D. "Hovercraft Liability" and E.4. "Insured's" Premises Not An "Insured Location" do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured".

F. **Coverage E – Personal Liability**

Coverage E does not apply to:

1. Liability:

   a. For any loss assessment charged against you as a member of an association, corporation or community of property owners, except as provided in D. Loss Assessment under Section II – Additional Coverages;

   b. Under any contract or agreement entered into by an "insured". However, this exclusion does not apply to written contracts:

      (1) That directly relate to the ownership, maintenance or use of an "insured location"; or

      (2) Where the liability of others is assumed by you prior to an "occurrence";

      unless excluded in a. above or elsewhere in this policy;

2. "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";

3. "Property damage" to property rented to, occupied or used by or in the care of an "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

4. "Bodily injury" to any person eligible to receive any benefits voluntarily provided or required to be provided by an "insured" under any:

   a. Workers' compensation law;

   b. Non-occupational disability law; or

   c. Occupational disease law;

5. "Bodily injury" or "property damage" for which an "insured" under this policy:

   a. Is also an insured under a nuclear energy liability policy issued by the:

      (1) Nuclear Energy Liability Insurance Association;

      (2) Mutual Atomic Energy Liability Underwriters;

      (3) Nuclear Insurance Association of Canada; or any of their successors; or

HO 00 03 10 00            Page 34 of 41

  b. Would be an insured under such a policy but for the exhaustion of its limit of liability; or

6. "Bodily injury" to you or an "insured" as defined under Definitions 5.a. or b.

   This exclusion also applies to any claim made or suit brought against you or an "insured":

   a. To repay; or

   b. Share damages with;

   another person who may be obligated to pay damages because of "bodily injury" to an "insured".

G. Coverage F – Medical Payments To Others

   Coverage F does not apply to "bodily injury":

   1. To a "residence employee" if the "bodily injury":

      a. Occurs off the "insured location"; and

      b. Does not arise out of or in the course of the "residence employee's" employment by an "insured";

   2. To any person eligible to receive benefits voluntarily provided or required to be provided under any:

      a. Workers' compensation law;

      b. Non-occupational disability law; or

      c. Occupational disease law;

   3. From any:

      a. Nuclear reaction;

      b. Nuclear radiation; or

      c. Radioactive contamination;

      all whether controlled or uncontrolled or however caused; or

      d. Any consequence of any of these; or

   4. To any person, other than a "residence employee" of an "insured", regularly residing on any part of the "insured location".

## SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

A. Claim Expenses

   We pay:

   1. Expenses we incur and costs taxed against an "insured" in any suit we defend;

HO 00 03 10 00          Page 35 of 41

2. Premiums on bonds required in a suit we defend, but not for bond amounts more than the Coverage E limit of liability. We need not apply for or furnish any bond;

3. Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit; and

4. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

**B. First Aid Expenses**

We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to an "insured".

**C. Damage To Property Of Others**

1. We will pay, at replacement cost, up to $1,000 per "occurrence" for "property damage" to property of others caused by an "insured".

2. We will not pay for "property damage":

   a. To the extent of any amount recoverable under Section I;

   b. Caused intentionally by an "insured" who is 13 years of age or older;

   c. To property owned by an "insured";

   d. To property owned by or rented to a tenant of an "insured" or a resident in your household; or

   e. Arising out of:

      (1) A "business" engaged in by an "insured";

      (2) Any act or omission in connection with a premises owned, rented or controlled by an "insured", other than the "insured location"; or

      (3) The ownership, maintenance, occupancy, operation, use, loading or unloading of aircraft, hovercraft, watercraft or "motor vehicles".

      This exclusion e.(3) does not apply to a "motor vehicle" that:

      (a) Is designed for recreational use off public roads;

      (b) Is not owned by an "insured"; and

      (c) At the time of the "occurrence", is not required by law, or regulation issued by a government agency, to have been registered for it to be used on public roads or property.

HO 00 03 10 00          Page 36 of 41

**D. Loss Assessment**

1. We will pay up to $1,000 for your share of loss assessment charged against you, as owner or tenant of the "residence premises", during the policy period by a corporation or association of property owners, when the assessment is made as a result of:

   a. "Bodily injury" or "property damage" not excluded from coverage under Section II -- Exclusions; or

   b. Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided such person:

      (1) Is elected by the members of a corporation or association of property owners; and

      (2) Serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

2. Paragraph I. Policy Period under Section II -- Conditions does not apply to this Loss Assessment Coverage.

3. Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

   a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

   b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

4. We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

## SECTION II – CONDITIONS

**A. Limit Of Liability**

Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the Coverage E limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence".

Our total liability under Coverage F for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage F limit of liability shown in the Declarations.

**B. Severability Of Insurance**

This insurance applies separately to each "insured". This condition will not increase our limit of liability for any one "occurrence".

HO 00 03 10 00               Page 37 of 41

**C. Duties After "Occurrence"**

In case of an "occurrence", you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

1. Give written notice to us or our agent as soon as is practical, which sets forth:

   a. The identity of the policy and the "named insured" shown in the Declarations;

   b. Reasonably available information on the time, place and circumstances of the "occurrence"; and

   c. Names and addresses of any claimants and witnesses;

2. Cooperate with us in the investigation, settlement or defense of any claim or suit;

3. Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";

4. At our request, help us:

   a. To make settlement;

   b. To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

   c. With the conduct of suits and attend hearings and trials; and

   d. To secure and give evidence and obtain the attendance of witnesses;

5. With respect to C. Damage To Property Of Others under Section II — Additional Coverages, submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in an "insured's" control;

6. No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury".

**D. Duties Of An Injured Person – Coverage F – Medical Payments To Others**

1. The injured person or someone acting for the injured person will:

   a. Give us written proof of claim, under oath if required, as soon as is practical; and

   b. Authorize us to obtain copies of medical reports and records.

2. The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

HO 00 03 10 00          Page 38 of 41

**E. Payment Of Claim – Coverage F – Medical Payments To Others**

Payment under this coverage is not an admission of liability by an "insured" or us.

**F. Suit Against Us**

1. No action can be brought against us unless there has been full compliance with all of the terms under this Section II.

2. No one will have the right to join us as a party to any action against an "insured".

3. Also, no action with respect to Coverage E can be brought against us until the obligation of such "insured" has been determined by final judgment or agreement signed by us.

**G. Bankruptcy Of An "Insured"**

Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

**H. Other Insurance**

This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

**I. Policy Period**

This policy applies only to "bodily injury" or "property damage" which occurs during the policy period.

**J. Concealment Or Fraud**

We do not provide coverage to an "insured" who, whether before or after a loss, has:

1. Intentionally concealed or misrepresented any material fact or circumstance;

2. Engaged in fraudulent conduct; or

3. Made false statements;

relating to this insurance.

---

**SECTIONS I AND II – CONDITIONS**

---

**A. Liberalization Clause**

If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

HO 00 03 10 00          Page 39 of 41

This Liberalization Clause does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented through introduction of:

1. A subsequent edition of this policy; or

2. An amendatory endorsement.

**B. Waiver Or Change Of Policy Provisions**

A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

**C. Cancellation**

1. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

2. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice.

   a. When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

   b. When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

   c. When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

      (1) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

      (2) If the risk has changed substantially since the policy was issued.

      This can be done by letting you know at least 30 days before the date cancellation takes effect.

   d. When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

3. When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

4. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

HO 00 03 10 00          Page 40 of 41

**D. Nonrenewal**

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

**E. Assignment**

Assignment of this policy will not be valid unless we give our written consent.

**F. Subrogation**

An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply to Coverage F or Paragraph C. Damage To Property Of Others under Section II – Additional Coverages.

**G. Death**

If any person named in the Declarations or the spouse, if a resident of the same household, dies, the following apply:

1. We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death; and

2. "insured" includes:

   a. An "insured" who is a member of your household at the time of your death, but only while a resident of the "residence premises"; and

   b. With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

The Company providing this insurance is the member of The Hartford Financial Services Group, Inc. designated in the Declarations (a stock insurance company.) The Company has caused this policy to be signed by its President and by a Secretary, but this policy shall not be binding unless countersigned on the Declarations by a duly authorized agent of the Company.

Brian S. Becker,
Secretary

David Zwiener,
President

HO 00 03 10 00          Page 41 of 41



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ProtectorPLUS   Zero Deductible
## LIMITED WAIVER OF DEDUCTIBLE

| Date of the Loss | Amount of the Loss |
|---|---|
| 1/1/2005 – 12/31/2008 | $20,000 |
| 1/1/2009 – 12/31/2012 | $22,500 |
| 1/1/2013 – 12/31/2016 | $25,000 |

The DEDUCTIBLE provision is replaced by:

Unless otherwise noted in this policy, the following deductible provision applies:

Subject to the policy limits that apply, we will pay only that part of the total of all loss payable under Section I that exceeds the deductible amount in the Declarations.

In the event that the total amount of a covered loss payable under Section I, before the application of a deductible, as determined by "us", exceeds the amount of the loss for the date of loss shown in the above schedule, the deductible amount up to but not in excess of $5,000 is waived.

This waiver of deductible applies to the base policy deductible specified in the Declarations, Deductible – Section I, only. It does not apply to other policy deductibles specified in the Declarations including, but not limited to, Hurricane, Earthquake, Coal Mine Subsidence, Special Wind/Hail or Optional Special Theft Deductibles.



THE
HARTFORD

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIAL PROVISIONS – ARIZONA

**DEFINITIONS**

The following definition is added:

12. "**Actual cash value**" means the amount it would currently cost to repair or replace covered property with new material of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence.

**SECTION I – PROPERTY COVERAGES**

**ADDITIONAL COVERAGES**

4. Fire Department Service Charge is deleted.

**SECTION I – EXCLUSIONS**

8. Intentional Loss is replaced by the following:
   a. We do not provide coverage for any loss arising out of any act committed by or at the direction of an "insured" with the intent to cause a loss.
   b. However, this exclusion will not apply to deny an "insured's" claim for an otherwise covered property loss under this policy if such loss is caused by an act of domestic violence by another "insured" under this policy and the "insured" making claim:
      (1) Did not cooperate in or contribute to the creation of the loss; and
      (2) Cooperates in any investigation relating to the loss.
      We may apply reasonable standards of proof for such claims.
   c. If we pay a claim pursuant to Paragraph 8.b., our payment to the "insured" is limited to that "insured's" insurable interest in the property less any payments we first made to a mortgagee or other party with a secured interest in the property.

   (This is Exclusion A.8. in Forms HO 00 03 and HO 00 05.)

**SECTION I – CONDITIONS**

E. Appraisal is replaced by the following:

E. **Appraisal**

If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose a competent and impartial umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:
1. Pay its own appraiser; and
2. Bear the other expenses of the appraisal and umpire equally.

I. Loss Payment is replaced by the following:

I. **Loss Payment**

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive your proof of loss and:

HW 01 50 10 07

1. Reach an agreement with you;
2. There is an entry of a final judgment; or
3. There is a filing of an appraisal award with us.

O. Concealment Or Fraud is replaced by the following:

O. **Concealment Or Fraud**

We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

1. Intentionally concealed or misrepresented any material fact or circumstance;
2. Made false statements of fact which, if known to us, would have caused us not to issue the policy; or
3. Engaged in fraudulent conduct relating to this insurance.

(This is Condition P, in Form HO 00 04.)

**SECTION II – CONDITIONS**

J. Concealment Or Fraud is replaced by the following:

J. **Concealment Or Fraud**

We do not provide coverage to an "insured" who, whether before or after a loss, has:

1. Intentionally concealed or misrepresented any material fact or circumstance;
2. Made false statements of fact which, if known to us, would have caused us not to issue the policy; or
3. Engaged in fraudulent conduct relating to this insurance.

**SECTION I AND II – CONDITIONS**

C. Cancellation is replaced by the following:

C. **Cancellation**

1. You may cancel this policy at any time by returning it to us or by letting us know of the date cancellation is to take effect.
2. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice will be mailed to you at your mailing address shown in the Declarations.

   Proof of mailing will be sufficient proof of notice.

   a. When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.
   b. When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.
   c. When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:
      (1) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy;
      (2) If the risk has changed substantially since the policy was issued, except to the extent that the insurer should reasonably have foreseen the change or contemplated the risk in writing the policy; or
      (3) If you fail to take reasonable steps to eliminate or reduce any conditions in or on the insured premises which contributed to a loss in the past or will increase the probability of future losses.

   This can be done by letting you know at least 30 days before the date cancellation takes effect.

3. When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.
4. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

2 of 3

**D.** Nonrenewal is replaced by the following:

**D.** Nonrenewal

We may elect not to renew this policy. We may do so by mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the end of the policy period. Proof of mailing will be sufficient proof of notice.

If our nonrenewal is based on the condition of the premises, you will be given 30 days' notice to remedy the identified conditions. If the identified conditions are remedied, coverage will be renewed. If the identified conditions are not remedied to our satisfaction, you will be given an additional 30 days, upon payment of premium, to correct the defective condition.

This provision will not apply and this policy will terminate:

1. At the end of the policy period, if you have agreed to nonrenewal; or
2. On the effective date of any other insurance policy, if you have accepted the other policy and it was issued as a replacement for this insurance.

**F.** Subrogation

The following is added:

If we pay an "insured", who is a victim of domestic violence, for a loss caused by an act of domestic violence, the rights of that "insured" to recover damages from the perpetrator of the violence are transferred to us to the extent of our payment. Following the loss, that "insured" may not waive such rights to recover against the perpetrator of the domestic violence.

All other provisions of this policy apply.

HW 01 50 10 07   Includes Copyrighted Material of Insurance Services Office, Inc., with its permission. ISO Properties, Inc., 2005



THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE.

## NO SECTION II – LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS
## LIMITED SECTION I – PROPERTY COVERAGES FOR HOME DAY CARE BUSINESS

A. "Business", as defined in the policy, means:

    1. A trade, profession or occupation engaged in on a full–time, part–time, or occasional basis; or

    2. Any other activity engaged in for money or other compensation, except the following:

        a. One or more activities:

            (1) Not described in b. through d. below; and

            (2) For which no "insured" receives more than $2000 in total compensation for the 12 months before the beginning of the policy period;

        b. Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

        c. Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

        d. The rendering of home day care services to a relative of an "insured".

B. If an "insured" regularly provides home day care services to a person or persons other than "insureds" as their trade, profession or occupation, that service is a "business".

C. If home day care service is not a given "insured's" trade, profession or occupation but is an activity:

    1. That an "insured" engages in for money or other compensation; and

    2. From which an "insured" receives more than $2,000 in total/combined compensation from it and any other activity for the 12 months before the beginning of the policy period;

    the home day care service and other activity will be considered a "business".

D. With respect to C. above, home day care service is only an example of an activity engaged in for money that may be a "business". Any single activity or combination of activities:

    1. Described in A.2. above, and

    2. Engaged in for money by a single "insured";

    may be considered a "business" if the $2000 threshold is exceeded.

E. With respect to A. through D. above, coverage does not apply to or is limited with respect to home day care service which is a "business". For example, this policy:

    1. Does not provide:

        a. Section II coverages. This is because a "business" of an "insured" is excluded under E.2. of Section II – Exclusions;

        b. Coverage, under Section I, for other structures from which any "business" is conducted; and

HO 04 96 10 00

2. Limits of Section I coverage, under Coverage C - Special Limits of Liability, for "business" property:

   a. On the "residence premises" for the home day care "business" to $2,500. This is because Category h. (e. in Form HO 00 08) imposes that limit on "business" property on the "residence premises";

   b. Away from the "residence premises" for the home day care "business" to $500. This is because Cetagory i. (f. in Form HO 00 08) imposes that limit on "business" property away from the "residene premises". Category i. does not apply to property described in Categories j. and k. (g. and h. respectively in Form HO 00 08).

HO 04 96 10 00

Copyright, Insurance Services Office, Inc., 1999



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# HOMEOWNERS POLICY POLLUTION EXCLUSION

The following is added to **Section II - Exclusions**, item E:

Coverages E and F do not apply to the following:

**9.   Pollutants**

"Bodily Injury" and "Property Damage" arising out of the discharge, dispersal, seepage, migration, release, or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape was caused by a peril insured against under Coverage C of this policy. POLLUTANTS means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, lead paint, oils and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

HW  01  04  06  03  (NS)



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDATORY ENDORSEMENT – SPECIFICALLY EXCEPTED PERILS

As used herein, "Peril" means a cause of physical loss or damage to property. It has this meaning whether or not it is called a "Peril" or a "Cause of Loss" in this policy.

Even if any of the terms of this policy might be construed otherwise, the following Perils, as described in Paragraphs A. and B. below, are SPECIFICALLY EXCEPTED FROM THIS POLICY. WE DO NOT COVER OR INSURE AGAINST LOSS OR DAMAGE DIRECTLY OR INDIRECTLY CAUSED BY, RESULTING FROM, CONTRIBUTED TO OR AGGRAVATED BY, OR WHICH WOULD NOT HAVE OCCURRED BUT FOR, EITHER OF THESE PERILS:

A.   ACTS, ERRORS OR OMISSIONS by you or others in:

1.   Planning, zoning, developing, surveying, testing or siting property;

2.   Establishing or enforcing any building code, or any standard, ordinance or law about the construction, use or repair of any property or materials, or requiring the tearing down of any property, including the removal of its debris;

3.   The design, specifications, workmanship, repair, construction, renovation, remolding, grading or compaction of all or any part of the following:

   a.   Land or buildings or other structures;

   b.   Roads, water or gas mains, sewers, drainage ditches, levees, dams, or other facilities; or

   c.   Other improvements or changes in or additions to land or other property.

4.   The furnishing of work, materials, parts or equipment in connection with the design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction of any of the above property or facilities; or

5.   The maintenance of any such property or facilities.

This exception A. applies whether or not the property or facilities described above are:

1.   Covered under this policy; or

2.   On or away from the covered premises.

This exception A. does not reduce the insurance for loss or damage caused directly by a Covered Peril.

As used in this endorsement:

1.   If this policy is written to cover the risk of loss from specifically named cause, "Covered Peril" means any Peril specifically named as covered; or

2.   If written to cover the risk of loss without specifying specifically named causes, "Covered Peril" means any Peril not described above and not otherwise excluded or excepted from the causes of loss covered by this policy.

B.   COLLAPSE, "CRACKING" OR "SHIFTING" of buildings, other stuctures or facilities, or their parts, if the collapse, "cracking" or "shifting":

1.   Occurs during "earth movement," "volcanic eruption" or "flood" condition or within 72 hours after they cease; and

2.   Would not have occurred but for "earth movement," "volcanic eruption" or "flood."

But if loss or damage by a covered Peril ensues at the covered premises, we will pay for that ensuring loss or damage.

HW 01 03 08 03 (NS)

This exception B. applies whether or not there are other provisions in this policy relating to collapse, "cracking" or "shifting" of buildings, other structures or facilities, or their parts. Any such provision is revised by this endorsement to include this exception.

But if this policy specifically covers (by endorsement or in any other way) loss or damage caused by one or more or the following Perils:

1. Earthquake;
2. Flood;
3. Volcanic action;
4. Volcanic eruption; or
5. Sinkhole collapse,

this exception B. will not reduce that coverage.

As used in this exception B.:

1. "Cracking" means cracking, separating, shrinking, bulging, or expanding;
2. "Shifting" means shifing, rising, settling, sinking, or lateral or other movement;
3. "Earth movement" means any earth movement, including but not limited to "earthquake," landslide, mudflow, erosion, contraction or expansion, subsidence, any movement of earth resulting from water combining with the ground or soil, and any other "shifting" of earth; all whether or not combined with "flood" or "volcanic eruption." It does not include sinkhold collapse if loss by sinkhole collapse is specifically covered in this policy;
4. "Earthquake" means a shaking or trembling of the earth's crust, caused by underground volcanic or tectonic forces or by breaking or "shifting" of rock beneath the surface of the ground from natural causes. An "Earthquake" includes al related shocks and after shocks;
5. "Volcanic eruption" means the eruption, explosion or effusion of a volcano. It does not include volcanic action if loss by volcanic action is specifically covered in this policy;
6. "Flood" means:
   a. Flood, surface water, waves, tides, tidal water, tidal waves, high water, and overflow of any body of water, or their spray, all whether driven by wind or not;
   b. Release of water held by a dam, levy or dike or by a water or flood control device;
   c. Water that backs up from a sewer or drain; or
   d. Water under the ground surface pressing on, or flowing, leaking or seeping through:
      (1) Foundations, walls, floors or paved surfaces;
      (2) Basements, whether paved or not; or
      (3) Doors, windows or other openings.

All other provisions of the policy apply.

HW 01 03 06 03 (NS)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PREMISES ALARM OR FIRE PROTECTION SYSTEM

We acknowledge the installation of an alarm system and/or automatic sprinkler system approved by us on the "residence premises". You agree to maintain this system or systems, for which we have granted a credit, in working order and to let us know promptly of any change, including removal, made to the system(s).

HO 04 16 10 00

Copyright, Insurance Services Office, Inc., 1999



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA COVERAGE

### FOR USE WITH ALL FORMS EXCEPT HO 00 03 AND HO 00 05

#### SCHEDULE*

These limits of liability apply to the total of all loss or costs payable under this endorsement, regardless of the number of occurrences, the number of claims made, or the number of locations insured under this endorsement and listed in the Schedule.

| | | |
|---|---|---|
| 1. | Section I - Property Coverage Limit of Liability for the Additional Coverage "Fungi", Wet Or Dry Rot, Or Bacteria | $ |
| 2. | Section II - Coverage E Aggregated Sublimit of Liability for "Fungi", Wet Or Dry Rot, Or Bacteria | $ |

*Entries may be left blank if shown elsewhere in this policy for this coverage.

## DEFINITIONS

The following definition is added:

**"Fungi"**

    a.  "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

    b.  Under Section II, this does not include any fungi that are, are on, or are contained in, a good or product intended for consumption.

## SECTION I - PROPERTY COVERAGES

### E. Additional Coverages

    Pargraph 10.k.(2)(d) is deleted in Form HO 00 05 only.

The following Additional Coverage is added:

    **13. "Fungi", Wet Or Dry Rot, Or Bacteria**

        a.  The amount shown in the Schedule above is the most we will pay for:

            (1)  The total of all loss payable under Section I —Property Coverages caused by "fungi", wet or dry rot, or bacteria;

            (2)  The cost to remove "fungi", wet or dry rot, or bacteria from property covered under Section I Property Coverages;

            (3)  The cost to tear our and replace any part of the building or other covered property as needed to gain access to the "fungi", wet or dry rot, or bacteria; and

            (4)  The cost of testing of air or property to confirm the absence, presence or level of "fungi", wet or dry rot, or bacteria whether performed prior to, during or after removal, repair, restoration or replacement. The cost of such testing will be provided only to the extent that there is a reason to believe that there is the presence of "fungi", wet or dry rot, or bacteria.

HO 04 27 04 02

b.   The coverage described in 13.a. only applies when such loss or costs are a result of a Peril Insured Against that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Peril Insured Against occurred.

c.   The amount shown in the Schedule for this coverage is the most we will pay for the total of all loss or costs payable under this Additional Coverage regardless of the:

(1)   Number of locations insured under this endorsement; or

(2)   Number of claims-made.

d.   If there is covered loss or damage to covered property, not caused, in whole or in part, by "fungi", wet or dry rot, or bacteria, loss payment will not be limited by the terms of this Additional Coverage, except to the extent that "fungi", wet or dry rot, or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I – PERILS INSURED AGAINST

In Form HO 00 03:

A.   Coverage A – Dwelling And Coverage B – Other Structures

Paragraph 2.c.(5) is deleted and replaced by the following:

(5)   Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

Paragraph 2.c.(6)(c) is deleted and replaced by the following:

(c)   Smog, rust or other corrosion;

B.   Coverage C – Personal Property

12.   Accidental Discharge Or Overflow Of Water Or Steam

Paragraph b.(4) is deleted and replaced by the following:

(4)   Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a peirod of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

In Form HO 00 05:

A.   Under Coverages A, B and C:

Paragraph 2.d. is deleted and replaced by the following:

d.   Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

Paragraph 2.e.(3) is deleted and replaced by the following:

(3)   Smog, rust or other corrosion;

## SECITON I – EXCLUSIONS

Exclusion A.10. is added.

10.   "Fungi", Wet Or Dry Rot, Or Bacteria

"Fungi", Wet Or Dry Rot, Or Bacteria meaning the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

This Exclusion does not apply:

a.   When "fungi", wet or dry rot, or bacteria results from fire or lightning; or

HO 04 27 04 02

b. To the extent coverage is provided for in the "Fungi", Wet Or Dry Rot, Or Bacteria Additional Coverage under Section I – Property Coverages with respece to loss caused by a Peril Insured Against other than fire or lightning.

Direct loss by a Peril Insured Against resulting from "fungi", wet or dry rot, or bacteria is covered.

## SECTION I – CONDITIONS

Condition P. Policy Period is deleted and replaced by the following:

### P.   Policy Period

This policy applies to loss or costs which occur durring the policy period.

## SECTION II – CONDITIONS

Condition A. Limit Of Liability is deleted and replaced by the following:

### A.   Limit Of Liability

Our total liability under Coverage E for all damages resulting form any one "occurrence" will not be more than the Coverage E limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims—made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions will be considered to be the result of one "occurrence".

Our total liability under Coverage F for all medical expenses payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage F limit of liability shown in the Declarations.

However, our total liability under Coverage E for the total of all damages arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi", wet or dry rot, or bacteria will not be more than the Section II – Coverage E Aggregate Sublimit of Liabiliy for "Fungi", Wet Or Dry Rot, Or Bacteria. That sublimit is the amount shown in the Schedule. This is the most we will pay regardless of the:

1.   Number of locations insured under the policy to which the endorsement is attached;

2.   Number of persons injured;

3.   Number of persons whose property is damaged;

4.   Number of "insureds"; or

5.   Number of "occurrences" or claims—made.

This sublimit is within, but does not increase, the Coverage E limit of liability. It applies separatelty to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations.

With respect to damages arising out of "fungi", wet or dry rot, or bacteria described in A. Limit Of Liability of this endorsement, Condition B. Severability Of Insurance is deleted and replaced by the following:

### B.   Severability Of Insurance

This insurance applies separately to each "insured" except with respect to the Aggregate Sublimit of Liability described in this endorsement under Section II – Conditions, A. Limit of Liability. This condition will not increase the limit of liability for this coverage.

All other provisions of the policy apply.



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL LIMITS OF LIABILITY
## FOR COVERAGES A, B, C, AND D
### FORMS HO 00 02, HO 00 03 AND HO 00 05 ONLY

(APPLIES ONLY WHEN LOSS TO THE BUILDING INSURED UNDER COVERAGE A
EXCEEDS THE COVERAGE A LIMIT OF LIABILITY SHOWN IN THE DECLARATIONS)

*Entry may be left blank if shown elsewhere in this policy for this coverage.

To the extent that coverage is provided, we agree to amend the present limits of liability in accordance with the following provisions:

A.  If you have:

1.  Allowed us to adjust the Coverage A limit of liability and the premium in accordance with:

a.  The property evaluations we make; and

b.  Any increase in inflation; and

2.  Notified us, within 30 days of completion, of any improvements, alterations or additions to the building insured under Coverage A which increase the replacement cost of the building by 5% or more;

The provisions of this endorsement will apply after a loss, provided you elect to repair or replace the damaged building.

B.  If there is a loss to the building insured under Coverage A that exceeds the Coverage A limit of liability shown in the Declarations:

1.  We will increase the Coverage A limit of liability to equal the current replacement cost of the building. However, in no event will such increased limit exceed ___\*___ times the Coverage A amount shown in the Declarations.

2.  We will increase, by the same percentage applied to Coverage A, the limits of liability for Coverages B, C, and D. However, we will do this only if the Coverage A limit of liability is increased under Paragraph B.1. as a result of a Coverage A loss;

3.  We will adjust the policy premium from the time of loss for the remainder of the policy term based on the increased limits of liability; and

4.  For the purpose of settling that loss only, Section I - Condition C. Loss Settlement, Paragraph 2. is deleted and replaced by Paragraphs 2., 3., and 4. as follows:

2.  Buildings covered under Coverage A or B at replacement cost without deduction for depreciation. We will pay no more than the smallest of the following amounts:

a.  The replacement cost of that part of the building damaged with material of like kind and quality and for like use;

b.  The necessary amount actually spent to repair or replace the damaged building; or

c.  The limit of liability under this policy that applies to the building, increased in accordance with Paragraphs B.1. and B.2. of this endorsement.

If the building is rebuilt at a new premises, the cost described in a. above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

3.  We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

4.  You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability on a replacement cost basis, provided you notify us of your intent to do so within 180 days after the date of loss.

All other provisions of this policy apply.

HW 04 11 08 03 (NS)                    Includes copyrighted material of Insurance Service Office, Inc., 1999

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIFETIME CONTINUATION AGREEMENT HOMEOWNERS

After the policy is in effect sixty (60) days, or if this is a renewal or continuation policy, we will continue the policy for as many additional policy periods as you wish, provided:

1. You pay the premium when due.
2. You maintain at least 80% of the full replacement cost of the dwelling under Coverage A.
3. We reserve the right to substitute more current forms and endorsements when they are approved and adopted.
4. You do not knowingly increase the hazard of the risk without written permission of the company.
5. There has not been a material misrepresentation of fact which if known to us would have caused us not to issue the policy.

All other provisions of this policy apply.

HW 01 01 06 03 (N5)



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PERSONAL PROPERTY REPLACEMENT COST LOSS SETTLEMENT

A.  **Eligible Property**

1.  Covered losses to the following property are settled at replacement cost at the time of the loss:
    a.  Coverage C; and
    b.  If covered in this policy:
        (1)  Awnings, outdoor antennas and outdoor equipment; and
        (2)  Carpeting and household appliances;
        whether or not attached to buildings.
2.  This method of loss settlement will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy and not subject to agreed value settlement:
    a.  Jewelry;
    b.  Furs and garments:
        (1)  Trimmed with fur; or
        (2)  Consisting principally of fur;
    c.  Cameras, projection machines, films and related articles of equipment;
    d.  Musical equipment and related articles of equipment;
    e.  Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding:
        (1)  Pens or pencils;
        (2)  Flasks;
        (3)  Smoking implements; or
        (4)  Jewelry; and
    f.  Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

    Personal Property Replacement Cost loss settlement will not apply to other classes of property separately described and specifically insured.

B.  **Ineligible Property**

    Property listed below is not eligible for replacement cost loss settlement. Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

1.  Antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.
2.  Memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value.
3.  Articles not maintained in good or workable condition.
4.  Articles that are outdated or obsolete and are stored or not being used.

C.  **Replacement Cost Loss Settlement Condition**

    The following loss settlement condition applies to all property described in A. above:

1.  We will pay no more than the least of the following amounts:
    a.  Replacement cost at the time of loss without deduction for depreciation;
    b.  The full cost of repair at the time of loss;

1 of 2

HO 04 90 10 00

     c.    The limit of liability that applies to Coverage C, if applicable;

     d.    Any applicable special limits of liability stated in this policy; or

     e.    For loss to any item described in A.2.a.-f. above, the limit of liability that applies to the item.

2.    If the cost to repair or replace the property described in A. above is more than $500, we will pay no more than the actual cash value for the loss until the actual repair or replacement is complete.

3.    You may make a claim for loss on an actual cash value basis and then make claim for any additional liability in accordance with this endorsement provided you notify us of your intent to do so within 180 days after the date of loss.

All other provisions of this policy apply.

HO 04 90 10 00

Copyright, Insurance Services Office, Inc., 1999



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# OTHER STRUCTURES ON THE RESIDENCE PREMISES
### INCREASED LIMITS

**SCHEDULE**∗

| Description Of Structure And Additional Limit Of Liability |
|---|
| |

∗Entries may be left blank if shown elsewhere in this policy for this coverage.

**SECTION I - PROPERTY COVERAGES**
**COVERAGE B - OTHER STRUCTURES**
We cover each structure that is:
1.  On the "residence premises"; and
2.  Described in the Schedule above;
for the additional limit of liability shown in the Schedule for that structure.
The limit shown is in addition to the Coverage B limit of liability.
Each additional limit of liability shown applies only to that described structure.

All other provisions of this policy apply.

Copyright, Insurance Services Office, Inc., 1999

HO 04 48 10 00



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EARTHQUAKE

### SCHEDULE*

Earthquake Deductible Percentage Amount:

Exterior Masonry Veneer Exclusion 1.

☐   Check here oly if this exclusion does not apply.

*Entries may be left blank if shown elsewhere in this policy for this coverage.

**A.   Coverage**

1.   We insure for direct physical loss to property covered under Section I caused by earthquake, including land shock waves or tremors before, during or after a volcanic eruption.

One or more earthquake shocks that occur within a seventy–two hour period constitute a single earthquake.

2.   This coverage does not increase the limits of liability stated in this policy.

**B.   Special Deductible**

The following replaces any other deductible provision in this policy with respect to loss covered under this endorsement:

We will pay only that part of the total of all loss payable under Section I, except:

1.   Coverage D; and

2.   The Additional Coverages;

that exceeds the earthquake deductible.

The dollar amount of the earthquake deductible is determined by multiplying either the:

Coverage A; or

Coverage C;

limit of liability shown in the Declarations, which–ever is greater, by the deductible percentage amount shown in the Schedule above.

The total deductible amount will not be less than $250.

**C.   Special Exclusions**

1.   **Exterior Masonry Veneer**

We do not cover loss to exterior masonry veneer caused by earthquake. The value of exterior masonry veneer will be deducted before applying the earthquake deductible described above. For the purpose of this exclusion, stucco is not considered masonry veneer.

2.   **Flood**

We do not cover loss resulting directly or indirectly from flood of any nature or tidal wave, whether:

a.   Caused by;

b.   Resulting from;

1 of 2

HO 04 54 10 00

  c. Contributed to by; or

  d. Aggravated by;

  earthquake.

 **3.** **Filling Land**

  This coverage does not include the cost of filling land.

**D.** **Exception To The Earth Movement Exclusion**

 The Section I – Earth Movement Exclusion does not apply to loss caused by earthquake, including land shock waves or tremors before, during or after a volcanic eruption.

All other provisions of this policy apply.

HO 04 54 10 00

Copyright, Insurance Services Office, Inc., 1999

Exhibit B

December 16, 2013

**THE HARTFORD**

Chris Vail
2013 West San Juan Trail
Tucson, AZ 85713

Re:  Insured:          Chris Vail
     Date of Loss:     07/15/2012
     Policy Number:    55 RBC 423052
     Claim Number:     PP0010789648
     CCPS Number:      YQQ KDP 36177

RECEIVED
DEC 2 3 2013

Dear Mr Vail:

Thank you for the opportunity to respond to the complaint inquiry submitted by you with respect to the claims filed for damage that occurred on 07/15/2012, referenced in the above claim number.

In the complaint you sent to Property and Casualty Insurance Company of Hartford ("The Hartford"), you explained that you are frustrated because to date, you do not feel that The Hartford has paid the appropriate amount of money to you for damages to the Dwelling sustained in this loss. You explained that the damage is over 18 months old and that The Hartford has not agreed on a final cost of repairs. You explained that while this is ongoing, the dwelling, specifically the roof, is incurring more damage because the roof has not been repaired and because of severe weather in the area.

I have reviewed the claim file including adjuster notes, information provided you, the Named Insured, and documentation related to the estimates for repair and resolution of this claim. On 09/27/2013, The Hartford provided a revised estimate to you that were based on the Engineer's report as well as the Outside Claim Adjuster's report. The total amount of this estimate is $30,370.10. This estimate constitutes the cost of repairs based on what was damaged as a result of the wind damage and ensuing damage sustained on the date of loss. At the time this estimate was provided, you refused payment based from this estimate, and explained that you did not agree with the Engineer's finding or the revised estimate. From that point you requested The Hartford pay for another engineer to inspect and report on the damages. The Hartford denied that request since we had already provided a capable and competent engineering firm to complete the first report. We also offered to have the Engineer meet with your Contractor to discuss the damages and you refused. Through the period of this investigation, The Hartford has paid the cost for you to stay away from the home since we did agree that during the reasonable period of investigation and repair the policy owed for Additional Living Expense. This coverage concluded after these reasonable periods expired and we had still had not reached any agreement with you.

After discussions with you regarding what damages were a result of this loss and what portions of your Contractor's estimates were presented to The Hartford for payment but not caused by or related to this loss, the Appraisal Clause of the policy was presented to you as an option. From this point you invoked the Appraisal Clause of the homeowner's policy. Following the conditions of the policy and the appraisal process, specific Appraiser's were appointed. At this juncture in the Appraisal process, an Umpire must be selected and agreed to by both appraisers. At this time, you have declined to accept each Umpire representative that has been presented to you. Since you have not chosen an Umpire to resolve and conclude the Appraisal portion of this loss, The Hartford has petitioned the Court to assign an Umpire to this case. Once the Courts have assigned an Umpire, the facts of this loss will be presented and will be evaluated by the Umpire and a final decision made.

The Hartford
10010 N. 25th Ave.
Phoenix, AZ 85021
Toll-Free (800) 811 4832
Fax      (877) 905 2372

Until the time the Umpire makes their decision regarding these damages, The Hartford will not be issuing any further monies to you for damages to the dwelling. Up to this point during the claim process, The Hartford has paid for competent vendor's to tarp and cover the roof to prevent any further damage inside the home. If there are additional damages sustained, that you have not reported to The Harford you must do so according to the provisions of the Policy. If you have incurred expenses for additional temporary repair to the home, you must provide those to our office for consideration of reimbursement. Again, there will be no further payment for damage made to you under Coverages A, B or D of this policy until such decision has been made by the Umpire governing the outcome of this case.

Please reference **SECTION I – PROPERTY COVERAGES**, of the HO3 (ed. 10-00) Homeowner's policy, which states in part:

**"E. Additional Coverages**

**2. Reasonable Repairs**

    **a.** We will pay the reasonable costs incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

    **b.** If the measures taken involve repair to other damaged property, we will only pay if that property is covered under this policy and the damage is caused by a Peril Insured Against. This coverage does not:

    **(1)** Increase the limit of liability that applies to the covered property; or

    **(2)** Relieve you of your duties, in case of a loss to covered property, described in **B.4.**, under Section I – Conditions."

Please also reference, **SECTION I – CONDITIONS**, which state:

**"B. Duties After Loss**
In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:

    **1.** Give prompt notice to us or our agent;

    **2.** Notify the police in case of loss by theft;

    **3.** Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in E.6. Credit Card, Electronic Fund Transfer Card or Access Devise, Forgery And Counterfeit Money under Section 1 - Property Coverages;

    **4.** Protect the property from further damage. If repairs to the property are required, you must:

        **(a)** Make reasonable and necessary repairs to protect the property; and

        **(b)** Keep an accurate record of repair expenses;

    **5.** Cooperate with us in the investigation of a claim;

    **6.** Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory.

    **7.** As often as we reasonably require:

        **a.** Show the damaged property;

        **b.** Provide us with records and documents we request and permit us to make copies; and

        **c.** Submit to examination under oath, while not in the presence of any other insured, and sign the same.

8. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:
   a. The time and cause of loss;
   b. The interest of the insured and all others in the property involved and all liens on the property;
   c. Other insurance which may cover this loss;
   d. Changes in title or occupancy of the property during the term of the policy;
   e. Specifications of damaged buildings and detailed repair estimates;
   f. The inventory of damaged personal property described in 2.e.above;
   g. Receipts for additional living expenses insured and records that support the fair rental value loss; and
   h. Evidence or affidavit that supports a claim under **E.6.** Credit Card, Electronic Fund Transfer Card or Access Device, Forgery And Counterfeit Money under Section 1 – Property Coverages, stating the amount and cause of loss.

**G. Suit Against Us.** No action can be brought against us unless there has been full compliance with all of the terms under Section 1 of this policy and the action is started within two years after the date of loss."

I have included the above policy language to for your reference that outlines and reaffirms our discussions regarding further damage. I have explained and outlined what the policy dictates in regards to your responsibilities for mitigation and for protecting the insured property from further damage.

Please be advised that all rights and defenses against coverage granted to this company by your policy are reserved. No estoppel is intended or may be inferred. No term, condition, or exclusion of the policy is waived.

I would be more than happy to provide any additional information you may require. Please feel free to contact me directly at the phone number below. Thank you for doing business with The Hartford.

Sincerely,

Russell Cantini

Russell Cantini
Property Team Leader
(602) 572-6436

Writing Company Name: Property & Casualty Insurance Company of Hartford

**For your protection Arizona law requires the following statement to appear on this form.**
**Any person who knowingly presents a false or fraudulent claim for payment of a loss is**
**subject to criminal and civil penalties.**

Exhibit C



ADJUSTERS FOR THE INSURED

January 3, 2014

DELIVERED BY FAX MAIL TO: 877 905 2872

FOLLOW UP BY MAIL

Russell Cantini, Team Leader
The Hartford
P.O. Box 14266
Lexington, KY 40512

Re:   Insured: Chris Vail                        Claim No: P P OO 10789648
                                                 Policy No: 55 R B C 423052
         Property Address: 2013 W. San Juan Trail, Tucson, AZ 85713
         Type of Loss: Wind/Hail                 Date of Loss: 7.15.12

Dear Team Leader Cantini:

I am Brown - O'Haver's SIU Public Adjuster. As such, it is my responsibility to investigate
inappropriate insurer behavior. I find that, unfortunately, The Hartford has not given Chris
Vail, the above referenced insured, a level playing field.

I must let you know that the following issues have been discovered as unusual insurer
behavior in this claim. This list is not meant to be all inclusive but is instead, a sampling of
tactics used against this insured that outside The Standard of Care in the Industry.

     1.  Hartford has refused to provide a certified copy of the insured's policy or even
address this issue. The original request for such a policy took place last year almost three
weeks ago.

     2.  Immediately after receiving notification of public adjuster involvement from our
firm, Hartford rushed out a letter to the insured and backdated the letter four days from the
December 20, 2013.    The letter was dated December 16, 2013.  The letter was not
received until December 23, 2013. The letter was copied to our office which shows that
Hartford did, indeed, know of our involvement when it backdated its letter.

     3.  Attempting to settle a claim for $ 30,370.10 without an estimate upon which that
number would be based.  I have in my possession an estimate for (ACV) 20,496.96 that
was dated 9/12/2012.  While that number cannot be reconciled with the $ 30,370.10
estimate, why was not that payment tendered fifteen months ago? The insured NEVER
refused this payment as asserted in your backdated letter. Was Hartford trying to force the
insured into acceptance of this inadequate sum?

     4.  Unconscionable delay and failure to provide the insured the "uncontested amount
of the claim" as required by Borland v. Safeco and only after pubic adjuster involvement
was any mention made as to what that amount would be.  Additionally, where is that
$30,370.10 check as promised in your backdated letter of December 16, 2013

January 3, 2014
Page 2
Russell Cantini

    5.  Hartford appointed a biased appraiser in this matter. Your appraiser markets himself to insurance companies. I would invite you to visit the website of your out of state appraiser, Ben Tunnel. Please go to his website and note that he lists over thirty insurance companies as his clients:

        http://btiappraisal.com/html/client-insurance.html

    One of Ben Tunnel's clients is, of course, The Hartford.

    For the record, I am aware of an appraisal Mr. Tunnel was involved in the past and it was a most contentious appraisal as Mr. Tunnel fought for his client base which, of course, includes Hartford.

    6.  Hartford appointed an out of state appraiser which institutionalized delays in this claim.

    7.  You advised the insured in your backdated letter that "appraisers were appointed". The insured did not appoint an appraiser and asked for more time to do so. As a followup to this, we are naming Michael Shontel as his appraiser. Mr. Shontel is an architect who can be reached at 480 593 8138. Mr. Shontel is not an out of state appraiser.

    8.  You advised the insured in your backdated letter that "you have declined each Umpire representative that has been presented to you". This does not make sense as the parties do not determine the umpire. The umpire is selected by the appraisers or by a court in the state in which the loss occurs.

    9.  You advised the insured in your backdated letter that "The Hartford has petitioned the Court to assign an Umpire in this case but have notified anyone of your petition to do so". We are demanding a copy of that court pleading so that we can have input into the selection or rejection of an umpire. This is serious, Mr. Cantini, and appears to be a violation of any number of Standards. We want a copy of this petition without delay.

    10.  You advised the insured in your backdated letter that " ... the facts of this loss will be presented and will be evaluated by the Umpire and a final decision made". This statement ignores the fact that the umpire is only one appraiser in a three person appraisal panel. The appraisal panel is not unlike a three judge appellate court.

    11.  Hartford has failed to outline the scope of the appraisal. What is the appraisal for? Is it for the entire claim? Will the appraisal determine loss of use damages? Please set forth just what is being appraised at this time.

    12.  Finally, you have included on your letter "For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties'. Please advise me to what statute or case law determination makes such a requirement.

For your information, we have an independent adjuster with the following credentials visiting

January 3, 2014
Page 2
Russell Cantini

the insured's home today to prepare an estimate: **CGA, AIC, CCA, PCLA, LPCS, HCI-R/C, Sr. General Adjuster Multi-line, CCL,** Certified: Umpire, Bus. Interruption, Wind, Flood, Roofing, Earthquake. I will provide you with a copy of the estimate and you may want to approve it and prevent the appraisal from going forward but if the appraisal goes forward, we are requesting that you appoint someone who doesn't market himself to insurers and who lives in the State of Arizona.

Finally, I need a copy of the policy. When might I have it?

Waiving none but reserving all rights and defenses of the insured, I remain,

Very truly yours,

David E. Young  CPPA, SPPA
Adjuster for the Insured

cc:     Insured by e-mail: vail1953@yahoo.com
        Dennis Brooks by e-mail: dennis.brooks@thehartford.com

Exhibit D



ADJUSTERS FOR THE INSURED

February 14, 2014

DELIVERED BY FAX MAIL TO: 866 809 8054

FOLLOW UP BY MAIL: dennis.brooks@thehartford.com

Dennis Brooks
The Hartford
P.O. Box 14266
Lexington, Kentucky 40512

DELIVERED BY FAX MAIL TO: 877 905 2572

Russell Cantini, Team Leader
The Hartford
P.O. Box 14266
Lexington, Kentucky 40512

Re:   Insured: Chris Vail                              Claim No:  P P 10789648
                                                       Policy No:  55 R B C 423052
      Property Address:  2013 W. San Juan Trail, Tucson, AZ  85713
      Type of Loss: Wind/Hail                          Date of Loss:  7.15.12

Dear Mr. Brooks,

Thank you for calling me this morning and advising me that you would be answering my
previous letters as well as one of today. I am pleased to now have your response but
very concerned at what was relayed in your letter of today, February 14, 2014. Please
allow me to go over some of the things in this letter. My response will not be complete but
will let you know how we see some of the issues in this claim.

I now have a Certified Copy of the policy. Thank you for forwarding it to me.

You told me how you came up with your calculation of $ 25,956.56 that is reflected in your
previous correspondence. You note that ServPro had a bill of $ 4,413.54. Has ServPro
been paid? Was the insured's name on the check that was paid to ServPro?

Who is Hartford's "consulting engineer"? Please let me know how this person was
selected. Is this person a member of the Investigative Engineer's Association (IEA)? IEA
advertises in Claims Magazine that its members are "trained to use their engineering
expertise to help insurer's control the rising cost of claims".

I told you in my letter of January 3 and I will tell you again, Mr. Vail did not refuse any funds.
Mr. Vail does not recall any conversations whatsoever about acceptance or lack of
acceptance of the release of funds. Indeed such a request that Hartford keep his money
would not be consistent with the fact that he took the funds from the original low ball offer of
around $ 8,000.00. Why would he not take the additional funds? We must reject your
response in regards to this subject.

611 E. McKellips Road / Mesa, AZ 85203 / Office: (480) 424-3933 / Fax: (480) 424-6999
www.brown-ohaver.com • email: info@brown-ohaver.com

Claim Representative Dennis Brooks
Property Team Leader Russell Cantini
Page 2
February 14, 2014

With all due respect, Ben Tunnel I must be replaced for various and important reasons but the most important being that he participated in a scheme to put an inexperienced insured in the role of serving as his own appraiser where Mr. Tunnell, based upon his vast knowledge of representing insurers and even putting Hartford's name on his website indicating Hartford is his client, could take advantage of someone who had no knowledge of how appraisals should be conducted.

May I kindly tell you that this is outrageous? I have never seen an insurer let an insured serve as his own appraiser. This is Brown - O'Haver's 26th year in Arizona and I have seen insurers fight to ascertain that appraisers have no relation to the insured. Indeed, the appraisal memorandum that Hartford and its friend Ben Tunnel use, clearly states that the appraisers must "not be related to the insured or have an interest" in the claim. We will not accept Ben Tunnel for any reason. His action in this claim is scandalous.

Please let me know who you wish to name as a non-tainted appraiser. If you do not replace Mr. Tunnel, the insured intends to retain counsel to replace Ben Tunnel. This will greatly impact Mr. Tunnel's partisan appraisals in the future if others discover that it was found that he couldn't serve in this appraisal.

Further, what is wrong with naming someone from the Better Business Bureau as an umpire?

You note: "As it turns out, no petition to appoint an umpire has ever been filed". Why did you suggest it had been filed? This entire appraisal process as orchestrated by Ben Tunnel and Hartford is appalling.

I look forward to the name of your new appraiser.

Finally, even though you didn't answer to all the points in my letter of January 3rd, I do appreciate your response, disconcerting as it is.

Waiving none but reserving all rights and defenses of the insured, I remain,

Very truly yours,

David E. Young  CPPA, SPPA
Adjuster for the Insured


cc:     Insured by e-mail: vail1953@yahoo.com

Exhibit E



ADJUSTERS FOR THE INSURED

February 14, 2014

DELIVERED BY FAX MAIL TO: 866 809 8054

FOLLOW UP BY MAIL: dennis.brooks@thehartford.com

Dennis Brooks
The Hartford
P.O. Box 14266
Lexington, KY 40512

Re:   Insured: Chris Vail                          Claim No: P P 10789648
                                                   Policy No: 55 R B C 423052
         Property Address: 2013 W. San Juan Trail, Tucson, AZ 85713
         Type of Loss: Wind/Hail              Date of Loss: 7.15.12

Dear Mr. Brooks,

On January 30, 2014, I sent you a letter telling you that I had not received a response to
my letter of January 3, 2014. Since writing that letter to you I note that you had sent me a
letter dated January 16, 2014 advising me that you had received my letter and was
working on a response.

I note that you have copied the Cavanaugh (sic) Law firm on your letter of January 16th.
Please let me know if someone there is responsible for the delay in your response. We
need to know so we can track their behavior in this matter. (The actual spelling is
Cavanagh).

I know that making a response to that letter will be difficult because of previous mishandling
of Mr. Vail's claim but I do appreciate your commitment to provide that response. Had you
and I been involved at this claim since its inception, we would not be coming to grips at this
late date with the problems Mr. Vail has had in this claim. You may want to refer your
insureds to public adjusters so that this kind of thing doesn't happen in the future. In the
meantime, we do need to know something about the petition to the court that The Hartford
said it had filed. Hartford clearly stated that this petition was in process thereby increasing
everyone's stress levels. Please help me today on this and let me know the status of this
petition. And, if such a statement about the filing was B.S or braggadocio, or an attempt to
harass or intimate the insured, just let us know.

On another matter, please find enclosed a proof of loss for the structure. The Hartford had
suggested the loss was $ 30,370.10 but never tendered anything like that to the
insured, even an estimate so we sent a professional estimator to the loss and his estimate is
attached to the proof of loss.

Please note that this is proof of loss is not a release of all claims.

We would hope that you would handle this proof of loss in accordance with Arizona law
which clearly mandates an immediate response and sets forth time periods in which a
response is required.

611 E. McKellips Road / Mesa, AZ 85203 / Office: (480) 424-3933 / Fax: (480) 424-6999
www.brown-ohaver.com • email: info@brown-ohaver.com

Claim Representative Dennis Brooks,
Page 2
February 14, 2014.

Finally, you have placed on your letter: "For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties". In reality, that verbiage is only to be included on "forms" not on letters. You may want to refer to A.R.S. 20-466.03 so that we can all get on the same page in complying with Arizona law.

I look forward to your I M M E D I A T E response.

Waiving none but reserving all rights and defenses of the Insured, I remain,

Very truly yours,

David E. Young  CPPA, SPPA
Adjuster for the Insured

Encl.: Proof of Loss and 18 page Estimate

cc:     Insured by e-mail: vail1953@yahoo.com

# Exhibit F



## BROWN O'HAVER

ADJUSTERS FOR THE INSURED

May 1, 2015

DELIVERED BY FAX MAIL TO: 866 809 8054

FOLLOW UP BY MAIL: dennis.brooks@thehartford.com

Dennis Brooks
The Hartford
P.O. Box 14266
Lexington, Kentucky 40512

Re:   Insured: Chris Vail                          Claim No: P P 10789648
                                                   Policy No: 55 R B C 423052
      Property Address: 2013 W. San Juan Trail, Tucson, AZ 85713
      Type of Loss: Wind/Hail                      Date of Loss: 7.15.12

Dear Mr. Brooks,

I am writing to you to express concern that your appraiser is delaying this claim.   He has a total disregard for Chris' Vail and his concerns.  He has institutionalized the word "delay". Chris's elderly mother is in a facility that is not working out and Chris wants to bring her home.  However, he can't bring her home to a damaged home.  The fraud that Hartford forced on the insured early on by tricking him to believe that Hartford had requested the courts to name an umpire when in fact this was a gross lie, all the while leading Chris to believe he could be his own appraiser, continues.

In over two months your appraiser has not responded to the insured's appraiser's proposal to conclude the appraisal.

I think what your appraiser is doing is preparing for a hearing in which he will present all of his information to the umpire without sharing that information in advance with the insured's appraiser.  That is not the spirit of the appraisal.  The appraisal is intended to send areas of disagreement to the umpire and any reasonable person would think that there would be some areas of agreement amongst the estimate prepared by the insured's appraiser.

This is pure b.s. (blowing smoke) and I am requesting that you get rid of your partisan appraiser so that the appraisal can proceed.  Your partisan appraiser is no better than the first appraiser you tried to foist upon the insured.

Thank you in advance for bringing some integrity to the appraisal of Mr. Vail by disposing of your appraiser.

Thank you in advance.

Very truly yours,

David E. Young  CPPA, SPPA
Adjuster for the Insured

cc:   Insured by e-mail: vail1953@yahoo.com

611 E. McKellips Road  /  Mesa, AZ 85203  /  Office: (480) 424-3933  /  Fax: (480) 424-6999
www.brown-ohaver.com  •  email: info@brown-ohaver.com

Exhibit G

*Appraisal Award*

"Insured"
Chris Vail

"Location"
2013 West San Juan Trail
Tucson, Arizona85713

"Policy"                "Claim"
55 RBC 42305          PP10789648

"Type of Loss"
Wind and Water Approximate Date of Loss
July 15, 2012

We, the undersigned, pursuant to our appointment as appraisers in the above mentioned referenced appraisal proceeding and in accordance with the Policy, DO HEREBY CERTIFY, that we have conscientiously performed the duties assigned to us and have appraised the amount of the loss arising from the Wind and Water Storm as follows:

1. The Replacement Cost of any such damage that resulted from the Wind and Water Storm occurring during the period of coverage provided by the Policy.

Replacement Cost Value
N/A

2. The Actual Cash Value of any such damage that resulted from the Wind and Water Storm occurring during the period of coverage provided by the Policy.

Actual Cash Value
$74,829.50

This is a compromise award agreed to by the appraisers. It is expressly intended to be inclusive of all possible water and wind damage of any nature to the building and all other building components, contents, both exterior and interior, at the Location.

This Appraisal Award is made without consideration of any Policy deductibles or prior claim payments by the insurer, which shall be subtracted from any payments owing as a result of the entry of this Appraisal Award. This Appraisal Award is made subject to all coverage terms, conditions, limitations and exclusions of the Policy.

_____      5/31/15      *Michael Shontell* 6-4-15

Jim D. Koontz – Appraiser for Insurer   Date      Michael C. Shontell Appraiser for Insured Date

Page 1 of 1

Exhibit H

From: **Dave Young** dave@brown-ohaver.com 
Subject: Fwd: Chris Vail Claim # PP0010789648
Date: August 8, 2015 at 2:18 PM
To: chris vail vail1953@yahoo.com

Begin forwarded message:

From: "Brooks, Dennis (Auto and Property Claims)" <Dennis.Brooks@thehartford.com>
Date: June 30, 2015 2:58:09 PM MST
To: Kelly <kelly@brown-ohaver.com>
Cc: Dave Young <dave@brown-ohaver.com>
Subject: RE: Chris Vail Claim # PP0010789648

I am checking on it and will keep you posted.

*Dennis Brooks*

Inside Claim Representative .
Toll free: 800-811-4832 Ext. 2303762
Fax: 866-809-8054
*Thank you for doing business with The Hartford!*
"PRIVILEGED AND CONFIDENTIAL: This electronic communication, including attachments, is for the
exclusive use of addressee and may contain proprietary, confidential and/or privileged information. If you
are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly
prohibited. If you are not the intended recipient, please notify sender immediately by phone, destroy this
communication and all copies."

From: Kelly [mailto:kelly@brown-ohaver.com]
Sent: Tuesday, June 30, 2015 2:31 PM
To: Brooks, Dennis (Auto and Property Claims)
Cc: Dave Young
Subject: Chris Vail Claim # PP0010789648

Hello Dennis,

I am following up on a voice mail I left you today on behalf of Dave Young regarding your insured Chris Vail's
Appraisal Award.

The Award was made a month ago and there are monies due. Please let us know when you are sending payment as
soon as possible.

Best Regards,

Kelly Lallatin
Brown - O'Haver Public Adjusters
611 East McKellips Road
Mesa, Arizona 85203
Phone: 480.424.3933
Fax: 480.424.6999
www.brown-ohaver.com
kelly@brown-ohaver.com

# BROWN



**ADJUSTERS FOR THE INSURED**

**************************************************
This communication, including attachments, is for the exclusive use of addressee and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.
**************************************************

David E. Young, CPPA, SPPA
Adjuster for the Insured
**Brown - O'Haver Public Adjusters**
611 East McKellips Road
Mesa, Arizona  85203
Phone 480 424 3933
Fax:  480 424 6999
www.brown-ohaver.com
dave@brown-ohaver.com



1  Michael N. Poli (State Bar No. 006431)
   MPoli@merlinlawgroup.com
2  Kesha A. Hodge (State Bar No. 021824)
3  KHodge@merlinlawgroup.com
   MERLIN LAW GROUP, P.A.
4  2999 North 44th Street, Suite 520
5  Phoenix, Arizona 85018
   Telephone:   (480) 315-9980
6  Facsimile:   (480) 315-9984
7  *Attorneys for Plaintiff*

8            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                    IN AND FOR THE COUNTY OF PIMA

10

11  | CHRIS VAIL, an individual, | Case No.:  C20172269 |

12         Plaintiff,

13                                        **DEMAND FOR JURY TRIAL**

        v.

14

15  PROPERTY AND CASUALTY
    INSURANCE COMPANY OF HARTFORD,
16  an Indiana corporation, commonly known and
    doing business as THE HARTFORD
17

18         Defendant.

19        Pursuant to the provisions of Arizona Rule of Civil Procedure 38(b ), Plaintiff Chris Vail

20  hereby requests a trial by jury of all issues triable of right by a jury in the above-captioned action.

21       DATED this 9th day of May 2017.

22                              MERLIN LAW GROUP, P.A.

23

24                      By____*/s/ Kesha A. Hodge*_____
25                              Michael N. Poli / Kesha A. Hodge
                                2999 North 44th Street, Suite 520
26                              Phoenix, Arizona 85018
                                *Attorneys for Plaintiff*
27

T1631880.DOCX:1                       1

1  Michael N. Poli (State Bar No. 006431)
   MPoli@merlinlawgroup.com
2  Kesha A. Hodge (State Bar No. 021824)
3  KHodge@merlinlawgroup.com
   MERLIN LAW GROUP, P.A.
4  2999 North 44th Street, Suite 520
5  Phoenix, Arizona 85018
   Telephone:   (480) 315-9980
6  Facsimile:   (480) 315-9984
7  *Attorneys for Plaintiff*

8              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                     IN AND FOR THE COUNTY OF PIMA

10

11  CHRIS VAIL, an individual,                    Case No.:   C20172269

12                   Plaintiff,

13         v.                                      **PLAINTIFF'S FIRST SET OF
                                                   REQUESTS FOR PRODUCTION
14                                                 OF DOCUMENTS TO
15  PROPERTY AND CASUALTY                          DEFENDANT HARTFORD**
    INSURANCE COMPANY OF HARTFORD,
16  an Indiana corporation, commonly known and
    doing business as THE HARTFORD
17

18                   Defendant.

19  **To:    DEFENDANT PROPERTY AND CASUALTY INSURANCE COMPANY**

20  **OF HARTFORD, commonly known and doing business as THE HARTFORD**

21  **and its Attorneys of Record**

22      Pursuant to Arizona Rule of Civil Procedure 34, Plaintiff Chris Vail hereby requests that

23  you produce the following designated documents for inspection and copying by Plaintiff at the

24  offices of his attorneys, Merlin Law Group, P.A., 2999 North 44th Street, Suite 520, Phoenix,

25  Arizona 85018, within thirty (30) days after service of this request.

26

27

Y1637835.DOCX:1                              1

## INSTRUCTIONS AND DEFINITIONS

A.    "Document" or "document" as used herein includes any written, electronic or other type of memorialization or documentation of data, words, ideas, concepts, thoughts, and the like, whether (i) contained on paper, plastic, parchment, or other non electronic medium, or (ii) recorded or maintained in computer or other electronic medium. It is intended to be given its broadest interpretation possible. For instance, by way of example but not limitation, it would include, not only a writing on paper, but also a painting on a canvas, a chart or graph. It also includes not only computer data, but electronic data in any form available, such as personal organizers, internet or email data, and the like.

B.    Each document, the production of which is requested herein, shall be produced as it is kept in the usual course of business. The name of the file from which it was produced, the identity of the person from whose file it was produced, and the identity of the present custodian of that file, shall each be set forth.

C.    As to each document produced, please specify which documents are being produced in response to which paragraph number of this request for production.

D.    If more than one copy of any document is in your possession, custody, or control, produce each copy that in any way differs from any other copy, including, without limitation, differences caused by writings placed thereon by any person; number of pages comprising the document; or documents attached thereto by staple, clip or otherwise.

E.    With respect to each document, the production of which is requested herein, that has been destroyed, or is otherwise no longer within your possession, custody or control, (a) identify the document; (b) describe in detail the circumstances under which it was destroyed, lost or otherwise came to be beyond your possession, custody or control; and (c) with respect to each document that was destroyed, specify the identity of the person authorizing such destruction.

F.    The requests for discovery are intended as continuing requests, and therefore, it is requested that you reasonably supplement your response hereafter.

J.       As to each document produced, you are requested to designate the paragraph and any subparagraph of this request to which each such document is responsive.

K.       With regard to the following requests for production, "Claim" refers to the Notice of Loss submitted on behalf of Plaintiff Chris Vail pertaining to the property and contents damage arising from a storm on or about July 15, 2012. Upon information and belief, the claim is internally referred to by Defendant Property and Casualty Insurance Company of Hartford ("Hartford") as Claim No. PP10789648.

L.       With regard to the following requests for productions, "Policy" refers to the property insurance policy issued by Defendant Property and Casualty Insurance Company of Hartford with Plaintiff Chris Vail as the insured. Upon information and belief, the policy is internally referred to by Defendant Property and Casualty Insurance Company of Hartford as Policy Number 55RBC423052.

## REQUESTS FOR PRODUCTION

1.       All complete claim files maintained for or pertaining to the Claim (as defined above), whether maintained in your field offices, regional offices, home office(s), or any other office, including, without limitation:

> a.     All written and electronic communications, such as, emails, and all written and electronic records of oral communications, whether in person or by telephone, to or from any of your employees or agents, relating in any way to the Claim and/or to any decision to pay or not pay the Claim;
>
> b.     All written and electronic records of any investigation conducted in connection with the Claim, including investigation materials and reports;
>
> c.     All claim activity logs, internal memoranda, correspondence, progress or status notes and any other documents pertaining in any way to the Claim; and

T1637835.DOCX;1

4

d.   All written and electronic communications, and written and electronic records of oral communications, whether in person or by telephone, between any of your employees, agents, or representatives, and any agent, employee, or representative of any contractor or subcontractor concerning the Claim.

This request is not limited to the primary adjuster only. This request includes the adjuster's file, as well as any files maintained by any supervisor, litigation specialist, litigation group, or claim review analysis group (such as audit groups) or any files related to the Claim maintained by any other person or entity associated with Defendant Property and Casualty Insurance Company of Hartford.

DATED this 9th day of May 2017.


MERLIN LAW GROUP, P.A.


By____ /s/ Kesha A. Hodge
      Michael N. Poli
      Kesha A. Hodge
      2999 North 44th Street, Suite 520
      Phoenix, Arizona 85018
      *Attorneys for Plaintiff*

1 | Michael N. Poli (State Bar No. 006431)
MPoli@merlinlawgroup.com
2 | Kesha A. Hodge (State Bar No. 021824)
3 | KHodge@merlinlawgroup.com
MERLIN LAW GROUP, P.A.
4 | 2999 North 44th Street, Suite 520
5 | Phoenix, Arizona 85018
Telephone: (480) 315-9980
6 | Facsimile: (480) 315-9984
7 | *Attorneys for Plaintiff*

8 | **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9 | **IN AND FOR THE COUNTY OF PIMA**

10

11 | CHRIS VAIL, an individual,                    Case No.: C20172269

12 |          Plaintiff,

13 |     v.                                         **PLAINTIFF'S FIRST SET OF**
                                                    **REQUESTS FOR PRODUCTION**
14 |                                                **OF DOCUMENTS TO**
                                                    **DEFENDANT HARTFORD**
15 | PROPERTY AND CASUALTY
INSURANCE COMPANY OF HARTFORD,
16 | an Indiana corporation, commonly known and
doing business as THE HARTFORD
17

18 |          Defendant.

19 | **To:  DEFENDANT PROPERTY AND CASUALTY INSURANCE COMPANY**

20 | **OF HARTFORD, commonly known and doing business as THE HARTFORD**

21 | **and its Attorneys of Record**

22 | Pursuant to Arizona Rule of Civil Procedure 34, Plaintiff Chris Vail hereby requests that

23 | you produce the following designated documents for inspection and copying by Plaintiff at the

24 | offices of his attorneys, Merlin Law Group, P.A., 2999 North 44th Street, Suite 520, Phoenix,

25 | Arizona 85018, within thirty (30) days after service of this request.

26

27

T1617835.DOCX:1                                    1

## INSTRUCTIONS AND DEFINITIONS

A. "Document" or "document" as used herein includes any written, electronic or other type of memorialization or documentation of data, words, ideas, concepts, thoughts, and the like, whether (i) contained on paper, plastic, parchment, or other non electronic medium, or (ii) recorded or maintained in computer or other electronic medium. It is intended to be given its broadest interpretation possible. For instance, by way of example but not limitation, it would include, not only a writing on paper, but also a painting on a canvas, a chart or graph. It also includes not only computer data, but electronic data in any form available, such as personal organizers, internet or email data, and the like.

B. Each document, the production of which is requested herein, shall be produced as it is kept in the usual course of business. The name of the file from which it was produced, the identity of the person from whose file it was produced, and the identity of the present custodian of that file, shall each be set forth.

C. As to each document produced, please specify which documents are being produced in response to which paragraph number of this request for production.

D. If more than one copy of any document is in your possession, custody, or control, produce each copy that in any way differs from any other copy, including, without limitation, differences caused by writings placed thereon by any person; number of pages comprising the document; or documents attached thereto by staple, clip or otherwise.

E. With respect to each document, the production of which is requested herein, that has been destroyed, or is otherwise no longer within your possession, custody or control, (a) identify the document; (b) describe in detail the circumstances under which it was destroyed, lost or otherwise came to be beyond your possession, custody or control; and (c) with respect to each document that was destroyed, specify the identity of the person authorizing such destruction.

F. The requests for discovery are intended as continuing requests, and therefore, it is requested that you reasonably supplement your response hereafter.

G.     This request for discovery is directed to all persons specified above, and all are requested to produce all documents and things which are in their individual possession (whether they be individuals or corporate entities), or in the possession of their attorneys, investigators, agents, employees, or any other representatives, or which are reasonably obtainable by any of the above.

H.     If, for any reason, you are unable to produce in full any document requested:

    a.     Produce each such document to the fullest extent possible;

    b.     Specify the reasons for your inability to produce the remainder; and

    c.     State in detail whatever information, knowledge, or belief you have concerning the whereabouts and substance of each document not produced in full.

I.     In the event you seek to withhold or do withhold any responsive document, in whole or in part, on the basis that it is not subject to discovery, product a list of all such documents and, as to each such document, state:

    a.     The name of the author, writer, editor or initiator of each such document;

    b.     The name of each recipient, addressee, or party to whom such document was sent or intended to be sent;

    c.     The name of each person who received a copy of the document;

    d.     The date of the document or, if no dates appears on the document, the date the document was prepared;

    e.     The title of the document or, if it has no title, then such other description of the document and its subject matter as shall be sufficient to identify the document; and

    f.     The grounds claimed for withholding the document from discovery and the factual basis for such a claim.

J.     As to each document produced, you are requested to designate the paragraph and any subparagraph of this request to which each such document is responsive.

K.     With regard to the following requests for production, "Claim" refers to the Notice of Loss submitted on behalf of Plaintiff Chris Vail pertaining to the property and contents damage arising from a storm on or about July 15, 2012. Upon information and belief, the claim is internally referred to by Defendant Property and Casualty Insurance Company of Hartford ("Hartford") as Claim No. PP10789648.

L.     With regard to the following requests for productions, "Policy" refers to the property insurance policy issued by Defendant Property and Casualty Insurance Company of Hartford with Plaintiff Chris Vail as the insured. Upon information and belief, the policy is internally referred to by Defendant Property and Casualty Insurance Company of Hartford as Policy Number 55RBC423052.

## REQUESTS FOR PRODUCTION

1.     All complete claim files maintained for or pertaining to the Claim (as defined above), whether maintained in your field offices, regional offices, home office(s), or any other office, including, without limitation:

    a.     All written and electronic communications, such as, emails, and all written and electronic records of oral communications, whether in person or by telephone, to or from any of your employees or agents, relating in any way to the Claim and/or to any decision to pay or not pay the Claim;

    b.     All written and electronic records of any investigation conducted in connection with the Claim, including investigation materials and reports;

    c.     All claim activity logs, internal memoranda, correspondence, progress or status notes and any other documents pertaining in any way to the Claim; and

4

TI637835.DOCX:1

1    d.  All written and electronic communications, and written and electronic
2      records of oral communications, whether in person or by telephone, between
3      any of your employees, agents, or representatives, and any agent, employee,
4      or representative of any contractor or subcontractor concerning the Claim.

5 This request is not limited to the primary adjuster only. This request includes the adjuster's file,
6 as well as any files maintained by any supervisor, litigation specialist, litigation group, or claim
7 review analysis group (such as audit groups) or any files related to the Claim maintained by any
8 other person or entity associated with Defendant Property and Casualty Insurance Company of
9 Hartford.

10   DATED this 9th day of May 2017.

11

12         MERLIN LAW GROUP, P.A.

13

14        By____ */s/ Kesha A. Hodge*____
          Michael N. Poli
15          Kesha A. Hodge
          2999 North 44th Street, Suite 520
16          Phoenix, Arizona 85018
17          *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

DL Investigations & Attorney Support LLC
7501 N. 16th Street, Suite 200
Phoenix, AZ 85020
(602) 285-9901

Inv. #
**118155**

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF PIMA**

**CHRIS VAIL**

Plaintiff / Petitioner,

vs.

**PROPERTY AND CASUALTY INSURANCE COMPANY OF
HARTFORD, dba THE HARTFORD**

Defendant / Respondent.

NO. C20172269
CERTIFICATE OF SERVICE

__Geoffrey Roberts__                           , the undersigned certifies under penalty of perjury:  That I am fully qualified pursuant to RCP 4 (d), 4 (e), 45 (b) and/or ARS 13-4072, to serve process in this case, and received for service the following documents in this action:
**SUMMONS & COMPLAINT, CERTIFICATE OF ARBITRATION, DEMAND FOR JURY TRIAL, PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT HARTFORD (Original and one copy)**

from              **Kesha A. Hodge c/o Merlin Law Group, P.A.**              on         **5/15/17**         ;
that I personally served copies of these documents on those named below in the manner and time and place shown; and except where noted, all services were made in Maricopa County, Arizona.

**NAME:**    **PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD, dba THE HARTFORD, c/o**
                 **Arizona Department of Insurance**
**DATE & TIME:**  5/15/17 2:05pm
**PLACE &**      2910 N. 44TH STREET  STE.210  PHOENIX, AZ 85018, which is his/her place of business.
**MANNER:**    By serving Yuliana Salinas, Fiscal Service Specialist, a person authorized to accept such service on their behalf, in person.

$15.00 service fee tendered. Description of the Named: Female, Age: 30's, Ht: 5' 3in., Wt: 190, Eyes: brown, Hair: black, Ethnicity: Hisp.

__Statement of Costs__
| | |
|---|---|
| Services | $16.00 |
| Mileage | $24.00 |
| Sp. Handl. | |
| **Witness** | |
| Advances | $15.00 |
| Cert. Prep | $10.00 |
| Other | $1.50 |
| **Total** | **$66.50** |

S/C

Affiant, Registered in
Maricopa County

ORIGINAL

The above is covered by A.R.S. as amended 41-314 & 11-45 and Rules 4, 5 and 45.

**In the Superior Court of the State of Arizona
In and For the County of** Pima

Case Number _____

**CIVIL COVER SHEET- NEW FILING ONLY**
(Please Type or Print)

Plaintiff's Attorney Kesha A Hodge

Attorney Bar Number 021824, AZ

Plaintiff's Name(s): (List all)

CHRIS VAIL

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

5/9/2017 3:23:40 PM
BY: SANDRA CASTILLO
DEPUTY

Case No. C20172269
HON. CYNTHIA T. KUHN

*Delivery Date: May 09, 2017 03:23 PM MST*

Plaintiff's Address:

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All) PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD, DBA THE HARTFORD

(List additional defendants on page two and/or attach a separate sheet)

EMERGENCY ORDER SOUGHT: ☐ Temporary Restraining Order   ☐ Provisional Remedy   ☐ OSC
☐ Election Challenge   ☐ Employer Sanction ☐ Other _____
(Specify)

☐ RULE 8(h) COMPLEX LITIGATION APPLIES. Rule 8(h) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties.
(Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category).

☐ THIS CASE IS ELIGIBLE FOR THE COMMERCIAL COURT UNDER EXPERIMENTAL RULE 8.1. (Maricopa County only.) Rule 8.1 defines a commercial case and establishes eligibility criteria for the commercial court. Generally, a commercial case primarily involves issues arising from a business contract or business transaction. However, consumer transactions are not eligible. A consumer transaction is one that is primarily for personal, family or household purposes. **Please review Rule 8.1 for a complete list of the criteria.** See http://www.superiorcourt.maricopa.gov/commercial-court/. You must check this box if this is an eligible commercial case. **In addition, mark the appropriate box below in the "Nature of Action" case category.** The words "eligible for commercial court" must appear in the caption of the original complaint.

## NATURE OF ACTION
(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**TORT MOTOR VEHICLE:**
☐ Non-Death/Personal Injury
☐ Property Damage
☐ Wrongful Death
**TORT NON-MOTOR VEHICLE:**
☐ Negligence
☐ Product Liability – Asbestos
☐ Product Liability – Tobacco
☐ Product Liability – Toxic/Other
☐ Intentional Tort

☐ Property Damage
☐ Legal Malpractice
☐ Malpractice – Other professional
☐ Premises Liability
☐ Slander/Libel/Defamation
☐ Other (Specify) _____
**MEDICAL MALPRACTICE:**
☐ Physician M.D.        ☐ Hospital
☐ Physician D.O         ☐ Other

AZturboCourt.gov Form Set #2[189301]

November 10, 2016                    Page 1                    AOCCV10F-010117

**CONTRACTS:**
- [ ] Account (Open or Stated)
- [ ] Promissory Note
- [ ] Foreclosure
- [ ] Buyer-Plaintiff
- [ ] Fraud
- [x] Other Contract (i.e. Breach of Contract)
- [ ] Excess Proceeds-Sale
- [ ] Construction Defects (Residential/Commercial)
  - [ ] Six to Nineteen Structures
  - [ ] Twenty or More Structures

**OTHER CIVIL CASE TYPES:**
- [ ] Eminent Domain/Condemnation
- [ ] Eviction Actions (Forcible and Special Detainers)
- [ ] Change of Name
- [ ] Transcript of Judgment
- [ ] Foreign Judgment
- [ ] Quiet Title
- [ ] Forfeiture
- [ ] Election Challenge
- [ ] NCC- Employer Sanction Action (A.R.S. §23-212)
- [ ] Injunction against Workplace Harassment
- [ ] Injunction against Harassment
- [ ] Civil Penalty
- [ ] Water Rights (Not General Stream Adjudication)
- [ ] Real Property
- [ ] Special Action against Lower Courts
  (See lower court appeal cover sheet in Maricopa)
- [ ] Immigration Enforcement Challenge (A.R.S. §§1-501, 1-502, 11-1051)

**UNCLASSIFIED CIVIL:**
- [ ] Administrative Review
  (See lower court appeal cover sheet in Maricopa)
- [ ] Tax Appeal
  (All other tax matters must be filed in the AZ Tax Court)
- [ ] Declaratory Judgment
- [ ] Habeas Corpus
- [ ] Landlord Tenant Dispute- Other
- [ ] Declaration of Factual Innocence (A.R.S. §12-771)
- [ ] Declaration of Factual Improper Party Status
- [ ] Vulnerable Adult (A.R.S. §46-451)
- [ ] Tribal Judgment
- [ ] Structured Settlement (A.R.S. §12-2901)
- [ ] Attorney Conservatorships (State Bar)
- [ ] Unauthorized Practice of Law (State Bar)
- [ ] Out-of-State Deposition for Foreign Jurisdiction
- [ ] Secure Attendance of Prisoner
- [ ] Assurance of Discontinuance
- [ ] In-State Deposition for Foreign Jurisdiction
- [ ] Eminent Domain– Light Rail Only
- [ ] Interpleader– Automobile Only
- [ ] Delayed Birth Certificate (A.R.S. §36-333.03)
- [ ] Employment Dispute- Discrimination
- [ ] Employment Dispute-Other
- [ ] Other (Specify) _____

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

- [ ] Antitrust/Trade Regulation
- [ ] Construction Defect with many parties or structures
- [ ] Mass Tort
- [ ] Securities Litigation with many parties
- [ ] Environmental Toxic Tort with many parties
- [ ] Class Action Claims
- [ ] Insurance Coverage Claims arising from the above-listed case types
- [ ] A Complex Case as defined by Rule 8(h) ARCP

Additional Plaintiff(s)

_____

_____

Additional Defendant(s)

_____

_____

AZTurboCourt.gov Form Set #2185301

Attachment Page __1__ (of __1__ )

To Civil Cover Sheet

**ATTORNEY INFORMATION:**
ATTORNEY FILING - PRIMARY ATTORNEY:
Kesha A Hodge
Bar Number: 021824, Issuing State: AZ
Law Firm: Merlin Law Group, P.A.
Address: 2999 N. 44th Street
Suite 520
Phoenix, AZ 85018
Telephone Number: (480) 315-9980
Email: KHodge@merlinlawgroup.com

ATTORNEY #2
Michael N. Poli
Bar Number: 006431, Issuing State: AZ
Law Firm: Merlin Law Group, P.A.
Address: 2999 N. 44th Street Suite 520
Phoenix, AZ 85018
Telephone Number: (480)315-9980


**ATTACHED DOCUMENTS LIST:**
Summons - Defendant #1
Certificate of Compulsory Arbitration
Complaint

If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.




*Pima County Clerk of Superior Court*
*Tucson, Arizona*

| | | Receipt Number: | 2816657 |
|---|---|---|---|
| Received for: | MICHAEL POLI | Date: | 5/9/2017 |
| Received from: | MICHAEL POLI | Case Number: | C20172269 |
| Amount Received: | $244.00 | Clerk Number: | 1,738 |

Caption:       CHRIS VAIL VS. PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD

Cash: $0.00          Check:  $0.00          Charge:  $0.00          ACH: $244.00

*Begin Financial Docket*

Civil Complaint                                    $244.00     PAID

*End Financial Docket*

Change Returned:   $0.00

Amount Refunded:   $0.00